UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA
and STATE OF INDIANA

                 Plaintiffs,

                                               Civil Action No. 2:22-cv-48

       v.

Northern Indiana Public Service Company LLC

                 Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# REMEDIAL DESIGN/REMEDIAL ACTION

# CONSENT DECREE

# FOR OPERABLE UNIT 2 OF THE

# TOWN OF PINES SUPERFUND SITE

**TABLE OF CONTENTS**

I.      BACKGROUND ........................................................................................ 1
II.     JURISDICTION ...................................................................................... 3
III.    PARTIES BOUND ................................................................................... 3
IV.     DEFINITIONS.......................................................................................... 3
V.      GENERAL PROVISIONS ..................................................................... 9
VI.     PERFORMANCE OF THE WORK ..................................................... 10
VII.    REMEDY REVIEW ............................................................................... 12
VIII.   PROPERTY REQUIREMENTS .......................................................... 13
IX.     FINANCIAL ASSURANCE ................................................................. 17
X.      PAYMENTS FOR RESPONSE COSTS .............................................. 21
XI.     INDEMNIFICATION AND INSURANCE .......................................... 24
XII.    FORCE MAJEURE ................................................................................ 26
XIII.   DISPUTE RESOLUTION ...................................................................... 27
XIV.    STIPULATED PENALTIES ................................................................. 29
XV.     COVENANTS BY PLAINTIFFS ......................................................... 33
XVI.    COVENANTS BY SD ............................................................................. 36
XVII.   EFFECT OF SETTLEMENT; CONTRIBUTION .............................. 38
XVIII.  ACCESS TO INFORMATION ............................................................. 39
XIX.    RETENTION OF RECORDS ............................................................... 40
XX.     NOTICES AND SUBMISSIONS ........................................................... 41
XXI.    RETENTION OF JURISDICTION ...................................................... 43
XXII.   APPENDICES .......................................................................................... 43
XXIII.  MODIFICATION ................................................................................... 43
XXIV.   LODGING AND OPPORTUNITY FOR PUBLIC COMMENT............ 44
XXV.    SIGNATORIES/SERVICE .................................................................... 44
XXVI.   FINAL JUDGMENT .............................................................................. 44

# I.    BACKGROUND

A.      The United States of America ("United States"), on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), and the State of Indiana ("the State"), on behalf of the Commissioner of the Indiana Department of Environmental Management ("IDEM"), filed a complaint ("Complaint") in this matter pursuant to Sections 106 and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended ("CERCLA"), 42 U.S.C. §§ 9606 and 9607, and pursuant to IC 13-12-3-2 and the Indiana Hazardous Substances Response Trust Fund at Indiana Code § 13-25-4 et seq.

B.      The United States and the State, in the Complaint seek, *inter alia*: (1) reimbursement of costs incurred for response actions undertaken by EPA and the Department of Justice ("DOJ") and for costs incurred by IDEM and the Indiana Office of the Attorney General for response actions at the Town of Pines Superfund Site in Town of Pines, Indiana ("Site"), together with accrued interest; and (2) performance of response actions by the Northern Indiana Public Service Company LLC ("NIPSCO") ("Settling Defendant" or "SD") at the Site consistent with the National Contingency Plan, 40 C.F.R. Part 300 ("NCP").

C.      The Settling Defendant that has entered into this CD does not admit any liability to Plaintiffs arising out of the transactions or occurrences alleged in the Complaint, nor does it acknowledge that the release or threatened release of hazardous substances at or from the Site constitutes an imminent and substantial endangerment to the public health or welfare or the environment.

D.      In response to a release or a substantial threat of a release of hazardous substances at or from the Site, EPA, Brown, Inc., Ddalt Corp. and Bulk Transport Corp. (together Brown, Inc., Ddalt Corp. and Bulk Transport Corp. are referred to as "Brown") and SD signed an Administrative Order on Consent effective April 5, 2004, to perform a Remedial Investigation and Feasibility Study ("RI/FS") for the Site pursuant to 40 C.F.R. § 300.430.

E.      SD and Brown completed a Remedial Investigation ("RI") Report on March 5, 2010, which EPA approved subject to conditions on May 28, 2010.

F.      In accordance with Section 104(a)(1) of CERCLA, 42 U.S.C. § 9604(a)(1), and 40 C.F.R. § 300.415, on October 15, 2015, EPA issued an Action Memorandum requiring that a time-critical removal action at the Site be conducted. On March 17, 2016, EPA and SD entered into an Administrative Settlement Agreement and Order on Consent ("ASAOC"), requiring SD to conduct the certain response actions required in the October 15, 2015 Action Memorandum.

G.      Since March 17, 2016, SD has been conducting work at the Site in accordance with the ASAOC. That work has included sampling properties at the Site to identify areas with coal ash residuals containing arsenic, thallium or lead at levels above designated cleanup levels. Of those properties sampled, nineteen (19) have been identified as containing arsenic, thallium or lead at levels above the designated cleanup levels and, therefore, requiring soil removal. Soil

1

removal work under the ASAOC has been completed at seventeen (17) properties. Of those properties, fourteen (14) required ongoing Institutional Controls.

H.      SD and Brown completed a Feasibility Study ("FS") Report on May 2, 2016 for the Site, which EPA approved on May 3, 2016. Pursuant to Section 117 of CERCLA, 42 U.S.C. § 9617, EPA published notice of the completion of the FS and of the proposed plan for remedial action on May 11, 2016, in a major local newspaper of general circulation. EPA provided an opportunity for written and oral comments from the public on the proposed plan for remedial action. A copy of the transcript of the public meeting is available to the public as part of the administrative record upon which the Superfund Division Director, EPA Region 5, based the selection of the response action.

I.      EPA selected a remedial action to be implemented at the Site in a final Record of Decision ("ROD"), issued on September 30, 2016, on which the State has given its concurrence. The ROD includes a responsiveness summary to the public comments. Notice of the final plan was published in accordance with Section 117(b) of CERCLA, 42 U.S.C. § 9617(b).

J.      The ROD requires, among other things, that the removal work agreed to in the ASAOC be incorporated into the Site cleanup plan.

K.      In accordance with the NCP and Section 121(f)(1)(F) of CERCLA, 42 U.S.C. § 9621(f)(1)(F), EPA notified the State on May 30, 2018, of negotiations with potentially responsible parties ("PRPs") regarding the implementation of the remedial design and remedial action ("RD/RA") for the Site, and EPA has provided the State with an opportunity to participate in such negotiations and be a party to this Consent Decree ("CD"), and the State has chosen to be a party.

L.      In accordance with Section 122(j)(1) of CERCLA, 42 U.S.C. § 9622(j)(1), EPA notified the United States Department of Interior, Indiana Department of Environmental Management and Indiana Department of Natural Resources on or about May 30, 2018, of negotiations with PRPs regarding the release of hazardous substances that may have resulted in injury to the natural resources under federal trusteeship and encouraged the trustee to participate in the negotiation of this CD.

M.      Pursuant to Section 117(c) of CERCLA, 42 U.S.C. § 9617, and 40 C.F.R. § 300.435(c)(2)(i), EPA issued an Explanation of Significant Differences ("ESD") to the ROD dated February 13, 2020 to which the State has also given its concurrence.

N.      Based on the information presently available to EPA and the State, EPA and the State believe that the Work will be properly and promptly conducted by SD if conducted in accordance with this CD and its appendices.

O.      For ease of implementation, EPA divided the Site into Operable Unit 1 and Operable Unit 2 in a memorandum dated September 28, 2021.

2

P.     Solely for the purposes of Section 113(j) of CERCLA, 42 U.S.C. § 9613(j), the remedy set forth in the ROD, as modified by the ESD, and the Work to be performed by SD shall constitute a response action taken or ordered by the President for which judicial review shall be limited to the administrative record.

Q.     The Parties recognize, and the Court by entering this CD finds, that this CD has been negotiated by the Parties in good faith and implementation of this CD will expedite the cleanup of the Site and will avoid prolonged and complicated litigation between the Parties, and that this CD is fair, reasonable, and in the public interest.

NOW, THEREFORE, it is hereby Ordered, Adjudged, and Decreed:

## II.     JURISDICTION

1.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1367, and 1345, and 42 U.S.C. §§ 9606, 9607, and 9613(b). This Court also has personal jurisdiction over SD. Solely for the purposes of this CD and the underlying Complaint, SD waives all objections and defenses that it may have to jurisdiction of the Court or to venue in this District. SD shall not challenge the terms of this CD or this Court's jurisdiction to enter and enforce this CD.

## III.     PARTIES BOUND

2.     This CD is binding upon the United States and the State and upon SD and its successors and assigns. Any change in ownership or corporate or other legal status of SD including, but not limited to, any transfer of assets or real or personal property, shall in no way alter SD's responsibilities under this CD.

3.     SD shall provide a copy of this CD to each contractor hired to perform the Work and to each person representing SD with respect to the Site or the Work, and shall condition all contracts entered into hereunder upon performance of the Work in conformity with the terms of this CD. SD or its contractors shall provide written notice of the CD to all subcontractors hired to perform any portion of the Work. SD shall nonetheless be responsible for ensuring that its contractors and subcontractors perform the Work in accordance with the terms of this CD. With regard to the activities undertaken pursuant to this CD, each contractor and subcontractor shall be deemed to be in a contractual relationship with SD within the meaning of Section 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3).

## IV.     DEFINITIONS

4.     Unless otherwise expressly provided in this CD, terms used in this CD that are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in this CD or its appendices, the following definitions shall apply solely for purposes of this CD:

"Administrative Settlement Agreement and Order on Consent" or "ASAOC" shall mean the Administrative Settlement Agreement and Order on Consent issued by EPA on March 17, 2016 with number CERCLA V-w-16-c-008.

"ASAOC Completed Properties" shall mean Properties where soil removal has been completed prior to the Effective Date and institutional controls were not required.

"ASAOC Completed Properties with Institutional Controls" shall mean Properties where, prior to the Effective Date, soil removal has been completed and soils contaminated above cleanup levels have been left in place and require ongoing institutional controls.

"Affected Property" shall mean all real property located at Operable Unit 2 and any other real property where EPA determines, at any time, that access, land, water, or other resource use restrictions, and/or Institutional Controls are needed to implement the Remedial Action at Operable Unit 2.

"CD Properties Remaining to be Sampled" shall mean those Properties located within Operable Unit 2 that have not yet been sampled by SD as of the Effective Date.

"CD Properties to be Remediated" shall mean all Properties located within Operable Unit 2 that this Consent Decree and SOW require SD to remediate. These consist of Known Properties Requiring Remediation and CD Properties Remaining to be Sampled that show following sampling to exceed the cleanup level for arsenic, thallium, and/or lead as set forth in the ROD.

"CD Completed Properties" shall mean the Properties within Operable Unit 2 where soil remediation has been completed after the Effective Date and EPA has determined that contaminated soils above cleanup levels have not been left in place and therefore no institutional controls are required.

"CD Completed Properties with Institutional Controls" shall mean Properties where, after the Effective Date, soil removal has been completed and soils contaminated above cleanup levels have been left in place and require institutional controls.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, 42 U.S.C. §§ 9601-9675.

"Coal Combustion Residuals" or "CCRs" shall mean the solid particles of non-combusted and noncombustible material resulting from the combustion of coal, including bottom ash and fly ash and any residual waste material from coal combustion. CCRs are also sometimes known as "coal ash."

"Consent Decree" or "CD" shall mean this consent decree and all appendices attached hereto (listed in Section XXII). In the event of conflict between this CD and any appendix, this CD shall control.

4

"Day" or "day" shall mean a calendar day. In computing any period of time under this CD, where the last day would fall on a Saturday, Sunday, or federal or State holiday, the period shall run until the close of business of the next working day.

"Deliverable" or "deliverable" shall mean any report, notice, plan, proposal, schedule or other submission to EPA required by the CD or SOW.

"DOJ" shall mean the United States Department of Justice and its successor departments, agencies, or instrumentalities.

"Effective Date" shall mean the date upon which the Court approval of this CD is recorded on the Court's docket.

"EPA" shall mean the United States Environmental Protection Agency and its successor departments, agencies, or instrumentalities.

"EPA Hazardous Substance Superfund" shall mean the Hazardous Substance Superfund established by the Internal Revenue Code, 26 U.S.C. § 9507.

"2020 ESD" shall mean the Explanation of Significant Differences signed on February 13, 2020, by the Director of the Superfund and Emergency Management Division as delegate of the Regional Administrator, EPA Region 5, and all attachments thereto.

"Future Response Costs" shall mean: (a) all costs, including, but not limited to, direct and indirect costs, that the United States incurs in reviewing or developing Deliverables, in overseeing implementation of the Work, or otherwise implementing, overseeing, or enforcing this CD, including, but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, the costs incurred pursuant to ¶ 11 (Emergencies and Releases), ¶ 12 (Community Involvement) (including the costs of any technical assistance plan under Section 117(e) of CERCLA, 42 U.S.C. § 9617(e)), ¶ 33 (Access to Financial Assurance), Section VII (Remedy Review), Section VIII (Property Requirements) (including the cost of attorney time and any monies paid to secure or enforce access or land, water, or other resource use restrictions and/or to secure, implement, monitor, maintain, or enforce Institutional Controls including the amount of just compensation), and Section XIII (Dispute Resolution), and all litigation costs (b) all Interim Response Costs, and (c) all Interest on the Past Response Costs SD has agreed to pay under this CD that has accrued pursuant to 42 U.S.C. § 9607(a) during the period from May 1, 2019 to the Effective Date.

"IDEM" shall mean the Indiana Department of Environmental Management and any successor departments or agencies.

"Institutional Controls" or "ICs" shall mean Proprietary Controls and state or local laws, regulations, ordinances, zoning restrictions, or other governmental controls or notices that: (a) limit land, water, or other resource use to minimize the potential for human exposure to Waste Material at or in connection with the Site; (b) limit land, water, or other resource use to implement, ensure non-interference with, or ensure the protectiveness of the RA; and/or

(c) provide information intended to modify or guide human behavior at or in connection with the Site.

"Interim Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, (a) paid by the United States and the State in connection with the Site between May 1, 2019 and the Effective Date, or (b) incurred prior to the Effective Date but paid after that date. Interim Response Costs shall not include any costs paid by SD prior to the Effective Date.

"Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year. Rates are available online at https://www.epa.gov/superfund/superfund-interest-rates.

"Known Properties Requiring Remediation" shall mean the two (2) Properties within Operable Unit 2 that SD has identified under the ASAOC as exceeding the soil cleanup levels set forth in the ROD that have not been remediated as of the Effective Date. These Properties are identified by unique property identifier numbers as (1) GS028 and (2) GS072.

"National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

"Non-Settling Owner" shall mean any person, other than SD, that owns or controls any Affected Property. The clause "Non-Settling Owner's Affected Property" means Affected Property owned or controlled by Non-Settling Owner.

"Operable Unit 1" or "OU 1" shall mean those portions of the Town of Pines Superfund Site where contamination of groundwater from the disposal of CCRs at Yard 520 have or may have come to be located. Work associated with OU 1 includes but is not limited to groundwater and residential drinking water well monitoring north and east of the North area of Yard 520 and west of the main branch of Brown Ditch.

"Operable Unit 2" or "OU 2" shall mean those portions of the Town of Pines Superfund Site where contamination of soil or groundwater from the disposal of CCRs outside of Yard 520 have or may have come to be located and those portions of the Town of Pines Superfund Site subject to ¶ 1.4(c) of the SOW. Work associated with OU 2 includes but is not limited to monitoring of groundwater in the areas north of the East Branch of Brown Ditch and east of the Main Branch of Brown Ditch; surface water and sediments of the East Branch of Brown Ditch; and residential drinking water wells in the area north of the East Branch of Brown Ditch, and east of the Main Branch of Brown Ditch. The OU 2 boundaries for addressing soil contamination and conducting groundwater monitoring are depicted on the map attached at Appendix C.

"Operation and Maintenance" or "O&M" shall mean all activities required to operate, maintain, and monitor the effectiveness of the RA as specified in the SOW or any EPA-approved O&M Plan.

"Paragraph" or "¶" shall mean a portion of this CD identified by an Arabic numeral or an upper or lower case letter.

"Parties" shall mean the United States, the State of Indiana, and SD.

"Past Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States paid at or in connection with the Site through April 30, 2019, plus Interest on all such costs that has accrued pursuant to 42 U.S.C. § 9607(a) through such date.

"Performance Standards" or "PS" shall mean the cleanup levels and other measures of achievement of the remedial action objectives, as set forth in the ROD. For monitored constituents without established cleanup levels, the performance standards are the appropriate risk-based screening level or site-specific background concentration, whichever has a higher concentration and as set forth in RDRA Work Plan as required by Section 3.1 of the SOW.

"Plaintiffs" shall mean the United States and the State of Indiana.

"Properties" shall mean all real property at OU 2 including property that contains single and multi-family dwellings, commercial businesses, government-owned property, vacant lots, parks, and green ways. Multiple adjacent parcels under common ownership and same type of usage shall be deemed a single Property.  Properties shall not include streets, roads, or any portion of a public right of way that lies outside the boundary of a parcel with a property identification number, as depicted on the Porter County GIS/Porter County Data Map https://portercogov.maps.arcgis.com/home/index.html.

"Proprietary Controls" shall mean easements or covenants running with the land that (a) limit land, water, or other resource use and/or provide access rights and (b) are created pursuant to common law or statutory law by an instrument that is recorded in the appropriate land records office.

"RCRA" shall mean the Solid Waste Disposal Act, as amended, 42 U.S.C. §§ 6901-6992 (also known as the Resource Conservation and Recovery Act).

"Record of Decision" or "ROD" shall mean the EPA Record of Decision relating to the Site signed on September 30, 2016, by the Superfund Division Director as delegate of the Regional Administrator, EPA Region 5, and all attachments thereto, as modified by the 2020 ESD. The ROD is attached as Appendix A.

"Remedial Action" or "RA" shall mean the remedial action selected in the ROD.

"Remedial Action for OU 2" or "RA for OU 2" shall mean the portion of the remedial action selected in the ROD that pertains to OU 2.

"Remedial Design" or "RD" shall mean those activities to be undertaken by SD to develop final plans and specifications for the RA for OU 2 as stated in the SOW.

"SD Affected Property" shall mean Affected Property owned or controlled by SD.

"Section" shall mean a portion of this CD identified by a Roman numeral.

"Settling Defendant" or "SD" shall mean Northern Indiana Public Service Company LLC, and its successors or assigns.

"State" shall mean the State of Indiana.

"State Future Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs that the State incurs in reviewing or developing Deliverables, in overseeing implementation of the Work, or otherwise implementing, overseeing, or enforcing this CD, including, but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, costs incurred pursuant to ¶ 11 (Emergencies and Releases), ¶ 12 (Community Involvement) (including the costs of any technical assistance plan  under Section 117(e) of CERCLA, 42 U.S.C. § 9617(e)), ¶ 33 (Access to Financial Assurance), Section VII (Remedy Review), Section VIII (Property Requirements) (including the cost of attorney time and any monies paid to secure or enforce access or land, water, or other resource use restrictions and/or to secure, implement, monitor, maintain, or enforce Institutional Controls including the amount of just compensation), and Section XIII (Dispute Resolution), and all litigation costs. State Future Response Costs shall also include all Interim Response Costs incurred or paid by the State that SD has agreed to pay under this CD.

"State Past Response Costs" shall mean all of the response costs that the State incurred at the Site before the Effective Date of this Consent Decree that were paid by EPA through a removal grant and that do not otherwise fall under the definition of Past Response Costs.

"Statement of Work" or "SOW" shall mean the document describing the activities SD must perform to implement the RD, the RA, and O&M regarding the Site, which is attached as Appendix B.

"Supervising Contractor" shall mean the principal contractor retained by SD to supervise and direct the implementation of the Work under this CD, selected in accordance with ¶ 9 of the Consent Decree

"Town of Pines Groundwater Plume Special Account" shall mean the special account, within the EPA Hazardous Substance Superfund, established for the Site by EPA pursuant to Section 122(b)(3) of CERCLA, 42 U.S.C. § 9622(b)(3), and the April 5, 2004, Administrative Order on Consent.

"Town of Pines Superfund Site" or "Site" consists of various properties within the Town of Pines, Porter County, Indiana, or within the Area of Investigation, depicted on the map attached at Appendix C, where CCRs have or may have been deposited, often as fill, and areas of groundwater contaminated by such CCRs. The Site includes a landfill containing primarily coal ash (Yard 520) and all locations where hazardous substances from the Town of Pines Superfund Site related to CCRs have or may have come to be located. The Town of Pines Superfund Site

8

has been known by different names, including Town of Pines Groundwater Plume Site and Town of Pines Groundwater Contamination Site.

"Transfer" shall mean to sell, assign, convey, lease, mortgage, or grant a security interest in, or where used as a noun, a sale, assignment, conveyance, or other disposition of any interest by operation of law or otherwise.

"United States" shall mean the United States of America and each department, agency, and instrumentality of the United States, including EPA.

"Waste Material" shall mean (a) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (b) any pollutant or contaminant under Section 101(33) of CERCLA, 42 U.S.C. § 9601(33); (c) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C.§ 6903(27); and (4) any "hazardous substance" under Indiana Statute IC 13-11-2-98 or "hazardous waste" under Indiana Statute IC 13-11-2-99.

"Work" shall mean all activities and obligations SD is required to perform under this CD, except the activities required under Section XIX (Retention of Records).

"Yard 520" shall mean the landfill located at or near the Town of Pines that contains primarily coal ash consisting of the South area which was constructed with a liner and the North area which was constructed without a liner and is currently being managed under IDEM's post-closure requirements for landfills as depicted on the map attached as Appendix C.

## V.    GENERAL PROVISIONS

5.    **Objectives of the Parties**. The objectives of the Parties in entering into this CD are to protect public health or welfare or the environment by the design and implementation of response actions at the Site by SD, to pay response costs of Plaintiffs, and to resolve the claims of Plaintiffs against SD as provided in this CD.

6.    **Commitments by SD**. SD shall finance and perform the Work in accordance with this CD, as well as in accordance with all Deliverables developed by SD and approved or modified by EPA pursuant to this CD. SD shall pay the United States for its response costs and the State for its response costs as provided in this CD.

7.    **Compliance with Applicable Law**. Nothing in this CD limits SD's obligations to comply with the requirements of all applicable federal and state laws and regulations. SD must also comply with all applicable or relevant and appropriate requirements of all federal and state environmental laws as set forth in the ROD and the SOW. The activities conducted pursuant to this CD, if approved by EPA, shall be deemed to be consistent with the NCP as provided in Section 300.700(c)(3)(ii) of the NCP.

8.    **Permits**.

a.    As provided in Section 121(e) of CERCLA, 42 U.S.C. § 9621(e), and Section 300.400(e) of the NCP, no permit shall be required for any portion of the Work

conducted entirely on-site (i.e., within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Work). Where any portion of the Work that is not on-site requires a federal or state permit or approval, SD shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.

       b.       SD may seek relief under the provisions of Section XII (Force Majeure) for any delay in the performance of the Work resulting from a failure to obtain, or a delay in obtaining, any permit or approval referenced in ¶ 8.a and required for the Work, provided that it has submitted timely and complete applications and taken all other actions necessary to obtain all such permits or approvals.

       c.       This CD is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

## VI.    PERFORMANCE OF THE WORK

9.    **Coordination and Supervision**.

    a.    **Project Coordinators**.

       (1)      SD shall designate a Project Coordinator who must have sufficient technical expertise to coordinate the Work. SD's Project Coordinator may not be an attorney representing SD in this matter and may not act as a Supervising Contractor. SD's Project Coordinator may assign other representatives, including other contractors, to assist in coordinating the Work.

       (2)      EPA shall designate and notify the SD of EPA's Project Coordinator and Alternate Project Coordinator. EPA may designate other representatives, which may include its employees, contractors and/or consultants, to oversee the Work. EPA's Project Coordinator/Alternate Project Coordinator will have the same authority as a remedial project manager and/or an on-scene coordinator, as described in the NCP. This includes the authority to halt the Work and/or to conduct or direct any necessary response action when he or she determines that conditions at the Site constitute an emergency or may present an immediate threat to public health or welfare or the environment due to a release or threatened release of Waste Material.

       (3)      The State shall designate and notify EPA and the SD of its Project Coordinator and Alternate Project Coordinator. The State may designate other representatives, including its employees, contractors and/or consultants to oversee the Work. For any meetings and inspections in which EPA's Project Coordinator participates, the State's Project Coordinator also may participate. SD shall notify the State reasonably in advance of any such meetings or inspections.

(4)     SD's Project Coordinator shall meet with EPA's and the State's Project Coordinator on a monthly basis, or such alternative frequency as may be determined by EPA.

b.     **Supervising Contractor**. SD's proposed Supervising Contractors must have sufficient technical expertise to supervise the Work and a quality assurance system that complies with ANSI/ASQC E4-2004, Quality Systems for Environmental Data and Technology Programs: Requirements with Guidance for Use (American National Standard).

c.     **Procedures for Disapproval/Notice to Proceed.**

(1)     SD shall designate, and notify EPA, within 30 days after the Effective Date, of the names, titles, contact information, and qualifications of the SD's proposed Project Coordinator and Supervising Contractor, whose qualifications shall be subject to EPA's review for verification based on objective assessment criteria (e.g., experience, capacity, technical expertise) and do not have a conflict of interest with respect to the project.

(2)     EPA, after a reasonable opportunity for review and comment by the State, shall issue notices of disapproval and/or authorizations to proceed regarding the proposed Project Coordinator and Supervising Contractor, as applicable. If EPA issues a notice of disapproval, SD shall, within 30 days, submit to EPA a list of supplemental proposed Project Coordinators and/or Supervising Contractors, as applicable, including a description of the qualifications of each. EPA shall issue a notice of disapproval or authorization to proceed regarding each supplemental proposed coordinator and/or contractor. SD may select any coordinator/contractor covered by an authorization to proceed and shall, within 21 days, notify EPA of SD's selection.

(3)     SD may change its Project Coordinator and/or Supervising Contractor, as applicable, by following the procedures of ¶¶ 9.c(1) and 9.c(2).

10.     **Performance of Work in Accordance with SOW**. SD shall: (a) develop the RD for OU 2; (b) perform the RA for OU 2; and (c) operate, maintain, and monitor the effectiveness of the RA for OU 2; all in accordance with the SOW and all EPA-approved, conditionally-approved, or modified deliverables as required by the SOW and in continuation with the process established under the ASAOC. All deliverables required to be submitted for approval under the CD or SOW shall be subject to approval by EPA in accordance with ¶ 5.6 (Approval of Deliverables) of the SOW.

11.     **Emergencies and Releases**. SD shall comply with the emergency and release response and reporting requirements under ¶ 3.5 (Emergency Response and Reporting) of the SOW. Subject to Section XV (Covenants by Plaintiffs), nothing in this CD, including ¶ 3.5 of the SOW, limits any authority of Plaintiffs: (a) to take all appropriate action to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release

11

of Waste Material on, at, or from the Site, or (b) to direct or order such action, or seek an order from the Court, to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site. If, due to SD's failure to take appropriate response action under ¶ 3.5 of the SOW, EPA or, as appropriate, the State, takes such action instead, SD shall reimburse EPA and the State under Section X (Payments for Response Costs) for all costs of the response action.

12.     **Community Involvement**. If requested by EPA, SD shall conduct community involvement activities under EPA's oversight as provided for in, and in accordance with, Section 2 (Community Involvement) of the SOW. Such activities may include, but are not limited to, designation of a Community Involvement Coordinator and implementation of a technical assistance plan. Costs incurred by the United States and by the State under this Section constitute Future Response Costs and State Future Response Costs, respectively, to be reimbursed under Section X (Payments for Response Costs).

13.     **Modification of SOW or Related Deliverables**.

a.      If EPA determines that it is necessary to modify the work specified in the SOW and/or in deliverables developed under the SOW in order to achieve and/or maintain the Performance Standards or to carry out and maintain the effectiveness of the RA, and such modification is consistent with the Scope of the Remedy set forth in ¶ 1.4 of the SOW, then EPA may notify SD of such modification. If SD objects to the modification, it may, within 30 days after EPA's notification, seek dispute resolution under Section XIII.

b.      The SOW and/or related work plans shall be modified: (1) in accordance with the modification issued by EPA; or (2) if SD invokes dispute resolution, in accordance with the final resolution of the dispute. The modification shall be incorporated into and enforceable under this CD, and SD shall implement all work required by such modification. SD shall incorporate the modification into the deliverable required under the SOW, as appropriate.

c.      Nothing in this Paragraph shall be construed to limit EPA's authority to require performance of further response actions as otherwise provided in this CD.

14.     Nothing in this CD, the SOW, or any deliverable required under the SOW constitutes a warranty or representation of any kind by Plaintiffs that compliance with the work requirements set forth in the SOW or related deliverable will achieve the Performance Standards.

## VII.   REMEDY REVIEW

15.     **Periodic Review**. SD shall conduct, in accordance with ¶ 3.9 (Periodic Review Support Plan) of the SOW, studies and investigations to support EPA's reviews under Section 121(c) of CERCLA, 42 U.S.C. § 9621(c), and applicable regulations, of whether the RA is protective of human health and the environment.

16.    **EPA Selection of Further Response Actions**. If EPA determines, at any time, that the RA is not protective of human health and the environment, EPA may select further response actions for the Site in accordance with the requirements of CERCLA and the NCP.

17.    **Opportunity to Comment**. SD and, if required by Sections 113(k)(2) or 117 of CERCLA, 42 U.S.C. § 9613(k)(2) or 9617, the public, will be provided with an opportunity to comment on any further response actions proposed by EPA as a result of the review conducted pursuant to Section 121(c) of CERCLA, 42 U.S.C. § 9621(c) and to submit written comments for the record during the comment period.

18.    **SD's Obligation to Perform Further Response Actions**. If EPA selects further response actions relating to the Site, EPA may require SD to perform such further response actions, but only to the extent that the reopener conditions in ¶ 68 or 69 (United States' Pre- and Post-Certification Reservations) are satisfied. SD may invoke the procedures set forth in Section XIII (Dispute Resolution) to dispute (a) EPA's determination that the reopener conditions of ¶ 68 or 69 are satisfied, (b) EPA's determination that the RA is not protective of human health and the environment, or (c) EPA's selection of the further response actions. Disputes regarding EPA's determination that the RA is not protective or EPA's selection of further response actions shall be resolved pursuant to ¶ 52 (Record Review).

19.    **Submission of Plans**. If SD is required to perform further response actions pursuant to ¶ 18, it shall submit a plan for such response action to EPA for approval in accordance with the procedures of Section VI (Performance of the Work by SD). SD shall implement the approved plan in accordance with this CD.

## VIII.   PROPERTY REQUIREMENTS

20.    **Agreements Regarding Access and Non-Interference.** SD shall, with respect to any Non-Settling Owner's Affected Property, use best efforts to secure from such Non-Settling Owner an agreement or agreements as required to implement the RD/RA for OU 2, enforceable by SD and by Plaintiffs, providing that such Non-Settling Owner shall, and SD shall, with respect to the SD's Affected Property, (i) provide Plaintiffs and SD, and its representatives, contractors, and subcontractors, with access at all reasonable times to such Affected Property to conduct any activity regarding the CD, including those listed in ¶ 20.a (Access Requirements); and (ii) refrain from using such Affected Property in any manner that EPA determines will pose an unacceptable risk to human health or to the environment due to exposure to Waste Material, or interfere with or adversely affect the implementation, integrity, or protectiveness of the Remedial Action for OU 2, including the restrictions listed in ¶ 20.b (Land or Other Resource Use Restrictions). SD shall, with respect to its Affected Property, execute an access and use restriction agreement that complies with ¶ 20(i) and (ii), above. SD shall provide a copy of each fully executed access and use restriction agreement to EPA and the State. SD shall also use best efforts to work with local officials to implement a local ordinance or equivalent restriction consistent with the ROD as set forth in paragraph 1.4(c) of the SOW.

13

a. **Access Requirements**. The following is a list of activities for which access is required regarding any Non-Settling Owner's and SD's Affected Property:

(1) implementing the Work or any portion of the Work;

(2) monitoring the Work or any portion of the Work;

(3) verifying any data or information submitted to the United States or the State;

(4) conducting investigations regarding contamination at or near the Site;

(5) obtaining samples;

(6) assessing the need for, planning, or implementing additional response actions at or near OU 2 portion of the Site;

(7) assessing implementation of quality assurance and quality control practices as defined in the approved construction quality assurance quality control plan as provided in the SOW;

(8) implementing the Work pursuant to the conditions set forth in ¶ 72 (Work Takeover);

(9) inspecting and copying records, operating logs, contracts, or other documents maintained or generated by SD or its agents, consistent with Section XVIII (Access to Information);

(10) assessing SD's compliance with the CD;

(11) determining whether the Affected Property is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted under the CD;

(12) implementing, monitoring, maintaining, reporting on, and enforcing any land, water, or other resource use restrictions and Institutional Controls;

The scope of each access agreement or agreements with each Affected Property will include the activities listed in 20.a(1)-(12) necessary to implement the Remedial Action.

b. **Land or Other Resource Use Restrictions**. The following is a list of land or other resource use restrictions applicable to any Non-Settling Owner's and SD's CD Completed Properties with Institutional Controls:

(1) prohibiting the following activities that could result in exposure to contaminants in subsurface soils:

14

          i.        removal or damage of visible marker barriers or similar materials placed over (and meant to indicate the presence of) contaminants present above soil cleanup levels;

          ii.       digging or other soil disturbance where coal ash derived contaminants are present above soil cleanup levels;

        (2)    prohibiting disposal of contaminated soil in a manner that doesn't comply with the conditions in this CD or the workplans approved thereunder or in a manner approved by the EPA RPM or the On-Scene Coordinator; and

        (3)    prohibiting construction of new structures on the Site by a Non-Settling Owner without first notifying SD, SD preparing and implementing a plan consistent with the Remedial Design Remedial Action Workplan, as described in paragraph 3.1 of the SOW, and completing the Work in the plan.

21.    **Resource Use Restrictions for SD Affected Properties**. SD shall ensure a restrictive covenant, enforceable by SD and by Plaintiffs that includes resource use restrictions listed in ¶ 20.b (Land or Other Resource Use Restrictions for Affected Properties), shall be executed and recorded in the event of the sale, to a Non-Settling Owner, of any of SD's Affected Property that is a CD Completed Property with Institutional Controls, a CD Property to be Remediated, or an ASAOC Completed Property with Institutional Controls.

22.    **Best Efforts**. As used in this Section VIII (Property Requirements), "best efforts" means the efforts that a reasonable person in the position of SD would use so as to achieve the goal in a timely manner, including the cost of employing professional assistance and the payment of reasonable sums of money, to secure access and/or use restriction agreements, Proprietary Controls, releases, subordinations, modifications, or relocations of prior encumbrances that affect the title to the Affected Property. If SD is unable to accomplish what is required through "best efforts" in a timely manner, it shall notify the United States and the State, and include a description of the steps taken to comply with the requirements. If the United States and the State deem it appropriate, the United States and/or the State may assist SD, or take independent action, in obtaining such access and/or use restrictions, Proprietary Controls, releases, subordinations, modifications, or relocations of prior encumbrances that affect the title to the Affected Property, as applicable. All costs incurred by the United States and the State in providing such assistance or taking such action, including the cost of attorney time and the amount of monetary consideration or just compensation paid, constitute Future Response Costs and State Future Response Costs, respectively, to be reimbursed under Section X (Payments for Response Costs).

23.    SD agrees that all restrictive covenants recorded pursuant to the ASAOC prior to the Effective Date of this CD provide EPA and IDEM the right to enforce those restrictive covenants in accordance with their terms.

24.    If EPA determines in a decision document prepared in accordance with the NCP that Institutional Controls in the form of state or local laws, regulations, ordinances, zoning

15

restrictions, or other governmental controls or notices are needed, SD shall cooperate with EPA's and the State's efforts to secure and ensure compliance with such Institutional Controls.

25. **Notice to Successors-in-Title**.

a. SD shall, within 30 days after the Effective Date, submit for EPA approval a notice to be filed regarding SD's Affected Property and SD's ASAOC Completed Properties with Institutional Controls in the appropriate land records. To the extent SD acquires Affected Property after the Effective Date, SD shall submit for EPA approval such notice within 30 days after Property acquisition. The notice must: (1) include a proper legal description of its Affected Property; (2) provide notice to all successors-in-title: (i) that its property is part of, or related to, the Site; (ii) that EPA has selected a remedy for the Site; and (iii) that potentially responsible parties have entered into a CD requiring implementation of such remedy; and (3) identify the U.S. District Court in which the CD was filed, the name and civil action number of this case, and the date the CD was entered by the Court. SD shall record the notice within 20 days after EPA's approval of the notice and submit to EPA, within 10 days thereafter, a certified copy of the recorded notice.

b. SD shall, prior to entering into a contract to Transfer SD's Affected Property or SD's ASAOC Completed Properties with Institutional Controls, or 60 days prior to transferring SD's Affected Property or SD's ASAOC Completed Properties with Institutional Controls, whichever is earlier:

(1) Notify the proposed transferee that EPA has selected a remedy regarding the Site, that potentially responsible parties have entered into a Consent Decree requiring implementation of such remedy, and that the United States District Court has entered the CD (identifying the name and civil action number of this case and the date the CD was entered by the Court); and

(2) Notify EPA and the State of the name and address of the proposed transferee and provide EPA and the State with a copy of the notice that it provided to the proposed transferee.

26. In the event of any Transfer of its Affected Property, unless the United States otherwise consents in writing, SD shall continue to comply with its obligations under the CD, including its obligation to secure access and ensure compliance with any land, water, or other resource use restrictions regarding the Affected Property and to implement, maintain, monitor, and report on Institutional Controls.

27. Notwithstanding any provision of the CD, Plaintiffs retain all of their access authorities and rights, as well as all of their rights to require land, water, or other resource use restrictions and Institutional Controls, including enforcement authorities related thereto, under CERCLA, RCRA, and pursuant to Indiana Code § 13-25-4-24 and any other applicable statute or regulations.

## IX.   FINANCIAL ASSURANCE

28.      In order to ensure completion of the Work, SD shall secure financial assurance, initially in the amount of $11,790,000 ("Estimated Cost of the Work"), for the benefit of EPA. The financial assurance in the amount of $6,100,000 must be one or more of the mechanisms listed in ¶ 28 a. - c., below, in a form substantially identical to the relevant sample documents available from EPA or under the "Financial Assurance - Settlements" category on the Cleanup Enforcement Model Language and Sample Documents Database at https://cfpub.epa.gov/compliance/models/, and satisfactory to EPA. SD may use multiple mechanisms if they are limited to surety bonds guaranteeing payment, letters of credit, and/or trust funds. The remainder financial assurance in the amount of $5,690,000 can be provided through an insurance policy, demonstration, or guarantee pursuant to ¶ 28.d., 28.e. or 28.f.

a.      A surety bond guaranteeing payment and/or performance of the Work that is issued by a surety company among those listed as acceptable sureties on federal bonds as set forth in Circular 570 of the U.S. Department of the Treasury;

b.      An irrevocable letter of credit, payable to or at the direction of EPA, that is issued by an entity that has the authority to issue letters of credit and whose letter-of-credit operations are regulated and examined by a federal or state agency; or

c.      A trust fund established for the benefit of EPA that is administered by a trustee that has the authority to act as a trustee and whose trust operations are regulated and examined by a federal or state agency.

d.      A policy of insurance that provides EPA with acceptable rights as a beneficiary thereof and that is issued by an insurance carrier that has the authority to issue insurance policies in the applicable jurisdiction(s) and whose insurance operations are regulated and examined by a federal or state agency;

e.      A demonstration by a SD that it meets the relevant test criteria of ¶ 30 accompanied by a standby funding commitment, which obligates the affected SD to pay funds to or at the direction of EPA, up to the amount financially assured through the use of this demonstration in the event of a Work Takeover; or

f.      A guarantee to fund or perform the Work executed in favor of EPA by a company: (1) that is a direct or indirect parent company of a SD or has a "substantial business relationship" (as defined in 40 C.F.R. § 264.141(h)) with a SD; and (2) can demonstrate to EPA's satisfaction that it meets the financial test criteria of ¶ 30.

29.      SD shall, within 60 days of the Effective Date, obtain EPA's approval of the form of SD's financial assurance. Within 30 days of such approval, SD shall secure all executed and/or otherwise finalized mechanisms or other documents consistent with the EPA-approved form of financial assurance and shall submit such mechanisms and documents to the Regional Comptroller, with a copy to the Regional Accountant, and to the United States, EPA, and the State as specified in Section XX (Notices and Submissions).

30.     SD seeking to provide financial assurance by means of a demonstration or guarantee under ¶ 28.e. or 28.f., must, within 30 days of the Effective Date:

a.     Demonstrate that:

    (1)     the affected SD or guarantor has:

        i.     Two of the following three ratios: a ratio of total liabilities to net worth less than 2.0; a ratio of the sum of net income plus depreciation, depletion, and amortization to total liabilities greater than 0.1; and a ratio of current assets to current liabilities greater than 1.5; and

        ii.     Net working capital and tangible net worth each at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; and

        iii.     Tangible net worth of at least $10 million; and

        iv.     Assets located in the United States amounting to at least 90 percent of total assets or at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; or

    (2)     The affected SD or guarantor has:

        i.     A current rating for its senior unsecured debt of AAA, AA, A, or BBB as issued by Standard and Poor's or Aaa, Aa, A or Baa as issued by Moody's; and

        ii.     Tangible net worth at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; and

        iii.     Tangible net worth of at least $10 million; and

        iv.     Assets located in the United States amounting to at least 90 percent of total assets or at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations

18

financially assured through the use of a financial test or guarantee; and

b.     Submit to EPA for the affected SD or guarantor: (1) a copy of an independent certified public accountant's report of the entity's financial statements for the latest completed fiscal year, which must not express an adverse opinion or disclaimer of opinion; and (2) a letter from its chief financial officer and a report from an independent certified public accountant substantially identical to the sample letter and reports available from EPA or under the "Financial Assurance - Settlements" subject list category on the Cleanup Enforcement Model Language and Sample Documents Database at https://cfpub.epa.gov/compliance/models/ (or successor site).

31.     SD providing financial assurance by means of a demonstration or guarantee under ¶28.e. or 28.f. must also:

a.     Annually resubmit the documents described in ¶ 30.b. within 90 days after the close of the affected Respondent's or guarantor's fiscal year;

b.     Notify EPA within 30 days after the affected Respondent or guarantor determines that it no longer satisfies the relevant financial test criteria and requirements set forth in this Section; and

c.     Provide to EPA, within 30 days of EPA's request, reports of the financial condition of the affected Respondent or guarantor in addition to those specified in ¶ 30.b.; EPA may make such a request at any time based on a belief that the affected SD or guarantor may no longer meet the financial test requirements of this Section.

32.     SD shall diligently monitor the adequacy of the financial assurance. If SD becomes aware of any information indicating that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, SD shall notify EPA of such information within 7 days. If EPA determines that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, EPA will notify the affected SD of such determination. SD shall, within 30 days after notifying EPA or receiving notice from EPA under this Paragraph, secure and submit to EPA for approval a proposal for a revised or alternative financial assurance mechanism that satisfies the requirements of this Section. EPA may extend this deadline for such time as is reasonably necessary for the affected SD, in the exercise of due diligence, to secure and submit to EPA a proposal for a revised or alternative financial assurance mechanism, not to exceed 60 days. SD shall follow the procedures of ¶ 34 (Modification of Financial Assurance) in seeking approval of, and submitting documentation for, the revised or alternative financial assurance mechanism. SD's inability to secure financial assurance in accordance with this Section does not excuse performance of any other obligation under this Settlement.

33.    **Access to Financial Assurance**.

a.    If EPA issues a notice of implementation of a Work Takeover under ¶ 72.b, then, in accordance with any applicable financial assurance mechanism and/or related standby funding commitment, EPA is entitled to: (1) the performance of the Work; and/or (2) require that any funds guaranteed be paid in accordance with ¶ 33.d.

b.    If EPA is notified by the issuer of a financial assurance mechanism that it intends to cancel the mechanism, and the affected SD fails to provide an alternative financial assurance mechanism in accordance with this Section at least 30 days prior to the cancellation date, the funds guaranteed under such mechanism must be paid prior to cancellation in accordance with ¶ 33.d.

c.    If, upon issuance of a notice of implementation of a Work Takeover under ¶ 72.b, either: (1) EPA is unable for any reason to promptly secure the resources guaranteed under any applicable financial assurance mechanism, whether in cash or in kind, to continue and complete the Work; or (2) the financial assurance is a demonstration or guarantee under ¶ 28.e or 28.f, then EPA is entitled to demand an amount, as determined by EPA, sufficient to cover the cost of the remaining Work to be performed. SD shall, within 30 days of such demand, pay the amount demanded as directed by EPA.

d.    Any amounts required to be paid under this ¶ 33 shall be, as directed by EPA: (i) paid to EPA in order to facilitate the completion of the Work by EPA, the State, or by another person; or (ii) deposited into an interest-bearing account, established at a duly chartered bank or trust company that is insured by the Federal Deposit Insurance Corporation ("FDIC"), in order to facilitate the completion of the Work by another person. If payment is made to EPA, EPA may deposit the payment into the EPA Hazardous Substance Superfund or into the Town of Pines Groundwater Plume Special Account within the EPA Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

e.    All EPA Work Takeover costs not paid under this ¶ 33 must be reimbursed as Future Response Costs under Section X (Payments for Response Costs).

34.    **Modification of Amount, Form, or Terms of Financial Assurance**. SD may submit, on any anniversary of the Effective Date or at any other time agreed to by the Parties, a request to reduce the amount, or change the form or terms, of the financial assurance mechanism. Any such request must be submitted to EPA and the State in accordance with ¶ 29, and must include an estimate of the cost of the remaining Work, an explanation of the bases for the cost calculation, and a description of the proposed changes, if any, to the form or terms of the financial assurance. EPA will notify SD of its decision to approve or disapprove a requested reduction or change pursuant to this Paragraph. SD may reduce the amount of the financial assurance mechanism only in accordance with: (a) EPA's approval; or (b) if there is a dispute, the agreement, final administrative decision, or final judicial decision resolving such dispute under Section XIII (Dispute Resolution). SD may change the form or terms of the financial

20

assurance mechanism only in accordance with EPA's approval. Any decision made by EPA on a request submitted under this Paragraph to change the form or terms of a financial assurance mechanism shall not be subject to challenge by SD pursuant to the dispute resolution provisions of this CD or in any other forum. Within 30 days after receipt of EPA's approval of, or the agreement or decision resolving a dispute relating to, the requested modifications pursuant to this Paragraph, SD shall submit to EPA documentation of the reduced, revised, or alternative financial assurance mechanism in accordance with ¶ 29.

35.     **Release, Cancellation, or Discontinuation of Financial Assurance**. SD may release, cancel, or discontinue any financial assurance provided under this Section only: (a) if EPA issues a Certification of Work Completion under ¶ 3.10 (Certifications of Work Completion) of the SOW; (b) in accordance with EPA's approval of such release, cancellation, or discontinuation; or (c) if there is a dispute regarding the release, cancellation or discontinuance of any financial assurance, in accordance with the agreement, final administrative decision, or final judicial decision resolving such dispute under Section XIII (Dispute Resolution).

## X.     PAYMENTS FOR RESPONSE COSTS

36.     **Payment by SD for United States' Past Response Costs**.

a.     Within 30 days after the Effective Date, SD shall pay to EPA $619,632.16 in payment for Past Response Costs. Payment shall be made in accordance with ¶ 38.a (instructions for past response cost payments).

b.     **Deposit of Past Response Costs Payment**. The total amount to be paid by SD pursuant to ¶ 36.a shall be deposited by EPA in the Town of Pines Groundwater Plume Special Account to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

37.     **Payments by SD for Future Response Costs**. SD shall pay to EPA and to IDEM and/or the Indiana Office of the Attorney General all Future Response Costs not inconsistent with the NCP.

a.     **Periodic Bills**. On a periodic basis, EPA will send SD a bill requiring payment that includes an Itemized Cost Summary, which includes direct and indirect costs incurred by EPA, its contractors, subcontractors, and DOJ. SD shall make all payments within 30 days after SD's receipt of each bill requiring payment, except as otherwise provided in ¶ 39, in accordance with ¶ 38.b (instructions for future response cost payments).

b.     **Deposit of Future Response Costs Payments**. The total amount to be paid by SD pursuant to ¶ 37.a (Periodic Bills) shall be deposited by EPA in the Town of Pines Groundwater Plume Special Account to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous

21

Substance Superfund, provided, however, that EPA may deposit a Future Response Costs payment directly into the EPA Hazardous Substance Superfund if, at the time the payment is received, EPA estimates that the Town of Pines Groundwater Plume Special Account balance is sufficient to address currently anticipated future response actions to be conducted or financed by EPA at or in connection with the Site. Any decision by EPA to deposit a Future Response Costs payment directly into the EPA Hazardous Substance Superfund for this reason shall not be subject to challenge by SD pursuant to the dispute resolution provisions of this CD or in any other forum.

   c. **Payments by SD to State**. SD shall pay to the State all State Future Response Costs not inconsistent with the NCP. On a periodic basis, IDEM and/or the Indiana Office of the Attorney General will send SD an invoice requiring payment that includes a cost summary. SD shall make payment within 60 days after SD's receipt of each bill requiring payment, except as otherwise provided in ¶ 39 (Contesting Future Response Costs). SD shall make all payments to IDEM required by this Paragraph by check made payable to the Indiana Hazardous Substances Response Trust Fund with a transmittal letter accompanying the check that references the name and address of the party making payment, the Site name [Town of Pines Superfund Site] and the IDEM site identification number [7500092] to

> Indiana Department of Environmental Management
> Attention: Cashier's Office – Mail Code 50-10C
> 100 North Senate Avenue
> Indianapolis, IN 46204-2251

SD shall make all payments to the Indiana Office of the Attorney General required by this Paragraph by check made payable to the "State of Indiana" with a transmittal letter accompanying the check that references the name and address of the party making payment, the Site name [Town of Pines Superfund Site], and the Office of the Attorney General File number, 140276, to

> Office of the Attorney General
> Attn: Asset Recovery & Bankruptcy
> 302 W. Washington St.
> IGCS 5th Floor
> Indianapolis, IN 46204

38. **Payment Instructions for SD**.

   a. **Past Response Costs Payments and Future Response Costs Prepayments**.

    (1) The Financial Litigation Unit (FLU) of the United States Attorney's Office for the Northern District of Indiana shall provide SD, in accordance with ¶ 94, with instructions regarding making payments to DOJ on

behalf of EPA. The instructions must include a Consolidated Debt Collection
System (CDCS) number to identify payments made under this CD.

(2)     For all payments subject to this ¶ 38.a, SD shall make such
payment by Fedwire Electronic Funds Transfer (EFT) / at https://www.pay.gov]
to the U.S. DOJ account, in accordance with the instructions provided under
¶ 38.a(1), and including references to the CDCS Number, Site/Spill ID
Number B5V9, and DJ Number 90-11-3-12060.

(3)     For each payment made under this ¶ 38.a, SD shall send notices,
including references to the CDCS, Site/Spill ID, and DJ numbers, to the United
States, EPA, and the EPA Cincinnati Finance Center, all in accordance with ¶ 94.

b.     **Future Response Costs Payments and Stipulated Penalties Payment
Instructions**. For all payments subject to this ¶ 38.b, SD shall make such payments by
Automatic Clearinghouse (ACH) / at https://www.pay.gov. Each payment shall include a
reference to the Site/Spill ID and DJ numbers.

ACH:                    PNC Bank
                        808 17th Street, NW
                        Washington, DC 20074
                        Contact -Jesse White 301-887-6548
                        ABA = 051036706
                        Transaction Code 22 -checking Environmental Protection Agency
                        Account 310006
                        CTX Format

https://www.pay.gov:    In accordance with instructions to be provided to SD by EPA
                        following lodging of the CD.

c.     **Notice of Payment**. For each payment made under ¶ 38, SD shall send
notices, including references to the CDCS, Site/Spill ID, and DJ numbers, to the United States,
EPA, and the EPA Cincinnati Finance Center, all in accordance with ¶ 94.

39.     **Contesting Future Response Costs**. SD may submit a Notice of Dispute,
initiating the procedures of Section XIII (Dispute Resolution), regarding any Future Response
Costs or any State Future Response Costs billed under ¶ 37 (Payments by SD for Future
Response Costs) if it determines that EPA or the State has made a mathematical error or included
a cost item that is not within the definition of Future Response Costs or State Future Response
Costs, or if it believes EPA or the State incurred excess costs as a direct result of an EPA or State
action that was inconsistent with a specific provision or provisions of the NCP. Such Notice of
Dispute shall be submitted in writing within 30 days after receipt of the bill and must be sent to
the United States (if the United States' accounting is being disputed) or the State (if the State's
accounting is being disputed) pursuant to Section XX (Notices and Submissions). Such Notice of
Dispute shall specifically identify the contested Future Response Costs or State Future Response
Costs and the basis for objection. If SD submits a Notice of Dispute, SD shall within the 30-day

23

period, also as a requirement for initiating the dispute, (a) pay all uncontested Future Response Costs to the United States and all uncontested State Future Response Costs to the State, and (b) establish, in a duly chartered bank or trust company, an interest-bearing escrow account that is insured by the FDIC, and remit to that escrow account funds equivalent to the amount of the contested Future Response Costs or State Future Response Costs. SD shall send to the United States or the State, as appropriate, as provided in Section XX (Notices and Submissions), a copy of the transmittal letter and check paying the uncontested Future Response Costs or State Future Response Costs, and a copy of the correspondence that establishes and funds the escrow account, including, but not limited to, information containing the identity of the bank and bank account under which the escrow account is established as well as a bank statement showing the initial balance of the escrow account. If the United States or the State prevails in the dispute, SD shall pay the sums due (with accrued interest) to the United States or the State, if State costs are disputed, within 7 days after the resolution of the dispute. If SD prevails concerning any aspect of the contested costs, SD shall pay that portion of the costs (plus associated accrued interest) for which it did not prevail to the United States or the State, if State costs are disputed, within 7 days after the resolution of the dispute. SD shall be disbursed any balance of the escrow account. All payments to the United States under this Paragraph shall be made in accordance with ¶ 38.b (instructions for future response cost payments). The dispute resolution procedures set forth in this Paragraph in conjunction with the procedures set forth in Section XIII (Dispute Resolution) shall be the exclusive mechanisms for resolving disputes regarding SD's obligation to reimburse the United States and the State for their Future Response Costs.

40. **Interest**. In the event that any payment for Past Response Costs, Future Response Costs or State Future Response Costs required under this Section is not made by the date required, SD shall pay Interest on the unpaid balance. The Interest on Past Response Costs shall begin to accrue on the Effective Date. The Interest on Future Response Costs or State Future Response Costs shall begin to accrue on the date of the bill. The Interest shall accrue through the date of SD's payment. Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to Plaintiffs by virtue of SD's failure to make timely payments under this Section including, but not limited to, payment of stipulated penalties pursuant to Section XIV (Stipulated Penalties).

## XI. INDEMNIFICATION AND INSURANCE

41. **SD's Indemnification of the United States and the State**.

a. The United States and the State do not assume any liability by entering into this CD or by virtue of any designation of SD as EPA's authorized representatives under Section 104(e) of CERCLA, 42 U.S.C. § 9604(e). SD shall indemnify, save, and hold harmless the United States and the State and their officials, agents, employees, contractors, subcontractors, and representatives for or from any and all claims or causes of action arising from, or on account of, negligent or other wrongful acts or omissions of SD, its officers, directors, employees, agents, contractors, subcontractors, and any persons acting on SD's behalf or under its control, in carrying out activities pursuant to this CD, including, but not limited to, any claims arising from

24

any designation of SD as EPA's authorized representatives under Section 104(e) of CERCLA. Further, SD agrees to pay the United States and the State all costs they incur including, but not limited to, attorneys' fees and other expenses of litigation and settlement arising from, or on account of, claims made against the United States and the State based on negligent or other wrongful acts or omissions of SD, its officers, directors, employees, agents, contractors, subcontractors, and any persons acting on their behalf or under their control, in carrying out activities pursuant to this CD. Neither the United States nor the State shall be held out as a party to any contract entered into by or on behalf of SD in carrying out activities pursuant to this CD. Neither SD nor any such contractor shall be considered an agent of the United States or the State.

        b.      The United States and the State, respectively, shall give SD notice of any claim for which the United States or the State plans to seek indemnification pursuant to this ¶ 41, and shall consult with SD prior to settling such claim.

       42.     SD covenants not to sue and agrees not to assert any claims or causes of action against the United States and the State, respectively, for damages or reimbursement or for set-off of any payments made or to be made to the United States or the State, arising from or on account of any contract, agreement, or arrangement between SD and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays. In addition, SD shall indemnify, save and hold harmless the United States and the State with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between SD and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays.

       43.    **Insurance**. No later than 15 days before commencing any on-site Work, SD shall secure, and shall maintain until the first anniversary after issuance of EPA's Certification of RA Completion for OU 2 pursuant to ¶ 3.8 (Certification of RA Completion for OU 2) of the SOW commercial general liability insurance with limits of liability of $1 million per occurrence, automobile liability insurance with limits of liability of $1 million per accident, and umbrella liability insurance with limits of liability of $5 million in excess of the required commercial general liability and automobile liability limits, naming the United States and the State as additional insureds with respect to all liability arising out of the activities performed by or on behalf of SD pursuant to this CD. In addition, for the duration of this CD, SD shall satisfy, or shall ensure that its contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of SD in furtherance of this CD. Prior to commencement of the Work, SD shall provide to EPA and the State certificates of such insurance and a copy of each insurance policy. SD shall resubmit such certificates and copies of policies each year on the anniversary of the Effective Date. If SD demonstrates by evidence satisfactory to EPA and the State that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering the same risks but in a lesser amount, then, with respect to that contractor or subcontractor, SD need provide only that portion of the insurance described above that is not maintained by the contractor or subcontractor. SD shall ensure that all submittals to EPA under

this Paragraph identify the Town of Pines Superfund Site, Town of Pines, Indiana and the civil action number of this case.

## XII.   FORCE MAJEURE

44.     "Force majeure," for purposes of this CD, is defined as any event arising from causes beyond the control of SD, of any entity controlled by SD, or of SD's contractors that delays or prevents the performance of any obligation under this CD despite SD's best efforts to fulfill the obligation. The requirement that SD exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure and best efforts to address the effects of any potential force majeure (a) as it is occurring and (b) following the potential force majeure such that the delay and any adverse effects of the delay are minimized to the greatest extent possible. "Force majeure" does not include financial inability to complete the Work or a failure to achieve the Performance Standards.

45.     If any event occurs or has occurred that may delay the performance of any obligation under this CD for which SD intends or may intend to assert a claim of force majeure, SD shall notify EPA's Project Coordinator orally or, in his or her absence, EPA's and the State's Alternate Project Coordinator or, in the event both of EPA's designated representatives are unavailable, the Director of the Superfund and Emergency Management Division, EPA Region 5, within 5 days of when SD first knew that the event might cause a delay. Within 14 days thereafter, SD shall provide in writing to EPA and the State an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; SD's rationale for attributing such delay to a force majeure; and a statement as to whether, in the opinion of SD, such event may cause or contribute to an endangerment to public health or welfare, or the environment. SD shall include with any notice all available documentation supporting its claim that the delay was attributable to a force majeure. SD shall be deemed to know of any circumstance of which SD, any entity controlled by SD, or SD's contractors or subcontractors knew or should have known. Failure to comply with the above requirements regarding an event shall preclude SD from asserting any claim of force majeure regarding that event, provided, however, that if EPA, despite the late or incomplete notice, is able to assess to its satisfaction whether the event is a force majeure under ¶ 44 and whether SD has exercised its best efforts under ¶ 44, EPA may, in its unreviewable discretion, excuse in writing SD's failure to submit timely or complete notices under this Paragraph.

46.     If EPA, after a reasonable opportunity for review and comment by the State, agrees that the delay or anticipated delay is attributable to a force majeure, the time for performance of the obligations under this CD that are affected by the force majeure will be extended by EPA, after a reasonable opportunity for review and comment by the State, for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure shall not, of itself, extend the time for performance of any other obligation. If EPA, after a reasonable opportunity for review and comment by the

26

State, does not agree that the delay or anticipated delay has been or will be caused by a force majeure, EPA will notify SD in writing of its decision. If EPA, after a reasonable opportunity for review and comment by the State, agrees that the delay is attributable to a force majeure, EPA will notify SD in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure.

47.      If SD elects to invoke the dispute resolution procedures set forth in Section XIII (Dispute Resolution) regarding EPA's decision, it shall do so no later than 15 days after receipt of EPA's notice. In any such proceeding, SD shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that SD complied with the requirements of ¶¶ 44 and 45. If SD carries this burden, the delay at issue shall be deemed not to be a violation by SD of the affected obligation of this CD identified to EPA and the Court.

48.      The failure by EPA to timely complete any obligation under the CD or under the SOW is not a violation of the CD, provided, however, that if such failure prevents SD from meeting one or more deadlines in the SOW, SD may seek relief under this Section.

## XIII.  DISPUTE RESOLUTION

49.      Unless otherwise expressly provided for in this CD, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes under this CD. However, the procedures set forth in this Section shall not apply to actions by the United States to enforce obligations of SD that have not been disputed in accordance with this Section.

50.      A dispute shall be considered to have arisen when one party sends the other parties a written Notice of Dispute. Any dispute regarding this CD shall in the first instance be the subject of informal negotiations between the parties to the dispute. The period for informal negotiations shall not exceed 20 days from the time the dispute arises, unless it is modified by written agreement of the parties to the dispute.

51.      **Statements of Position**

a.      In the event that the parties cannot resolve a dispute by informal negotiations under the preceding Paragraph, then the position advanced by EPA shall be considered binding unless, within 45 days after the conclusion of the informal negotiation period, SD invokes the formal dispute resolution procedures of this Section by serving on the United States and the State a written Statement of Position on the matter in dispute, including, but not limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by SD. The Statement of Position shall specify SD's position as to whether formal dispute resolution should proceed under ¶ 52 (Record Review) or 53.

b.      Within 45 days after receipt of SD's Statement of Position, EPA will serve on SD its Statement of Position, including, but not limited to, any factual data, analysis, or

27

opinion supporting that position and all supporting documentation relied upon by EPA. EPA's Statement of Position shall include a statement as to whether formal dispute resolution should proceed under ¶ 52 (Record Review) or 53. Within 30 days after receipt of EPA's Statement of Position, SD may submit a Reply.

c.    If there is disagreement between EPA and SD as to whether dispute resolution should proceed under ¶ 52 (Record Review) or 53, the parties to the dispute shall follow the procedures set forth in the Paragraph determined by EPA to be applicable. However, if SD ultimately appeal to the Court to resolve the dispute, the Court shall determine which Paragraph is applicable in accordance with the standards of applicability set forth in ¶¶ 52 and 53.

52.    **Record Review**. Formal dispute resolution for disputes pertaining to the selection or adequacy of any response action and all other disputes that are accorded review on the administrative record under applicable principles of administrative law shall be conducted pursuant to the procedures set forth in this Paragraph. For purposes of this Paragraph, the adequacy of any response action includes, without limitation, the adequacy or appropriateness of plans, procedures to implement plans, or any other items requiring approval by EPA under this CD, and the adequacy of the performance of response actions taken pursuant to this CD. SD shall not challenge, using the dispute resolution procedures under Section XIII, or judicially, EPA's remedial action selection embodied in the ROD.

a.    An administrative record of the dispute shall be maintained by EPA and shall contain all statements of position, including supporting documentation, submitted pursuant to this Section. Where appropriate, EPA may allow submission of supplemental statements of position by the parties to the dispute.

b.    The Director of the Superfund and Emergency Management Division, EPA Region 5, will issue a final administrative decision resolving the dispute based on the administrative record described in ¶ 52.a. This decision shall be binding upon SD, subject only to the right to seek judicial review pursuant to ¶¶ 52.c and 52.d.

c.    Any administrative decision made by EPA pursuant to ¶ 52.b shall be reviewable by this Court, provided that a motion for judicial review of the decision is filed by SD with the Court and served on all Parties within 20 days after receipt of EPA's decision. The motion shall include a description of the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of this CD. The United States may file a response to SD's motion.

d.    In proceedings on any dispute governed by this Paragraph, SD shall have the burden of demonstrating that the decision of the Superfund and Emergency Management Division Director is arbitrary and capricious or otherwise not in accordance with law. Judicial review of EPA's decision shall be on the administrative record compiled pursuant to ¶ 52.a.

28

53.     Formal dispute resolution for disputes that neither pertain to the selection or adequacy of any response action nor are otherwise accorded review on the administrative record under applicable principles of administrative law, shall be governed by this Paragraph.

      a.     The Director of the Superfund and Emergency Management Division, EPA Region 5, will issue a final decision resolving the dispute based on the statements of position and reply, if any, served under ¶ 51. The Superfund and Emergency Management Division Director's decision shall be binding on SD unless, within 20 days after receipt of the decision, SD files with the Court and serves on the parties a motion for judicial review of the decision setting forth the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of the CD. The United States may file a response to SD's motion.

      b.     Notwithstanding ¶ P (CERCLA § 113(j) record review of ROD and Work) of Section I (Background), judicial review of any dispute governed by this Paragraph shall be governed by applicable principles of law.

54.     The invocation of formal dispute resolution procedures under this Section does not extend, postpone, or affect in any way any obligation of SD under this CD, except as provided in ¶ 39 (Contesting Future Response Costs), as agreed by EPA, or as determined by the Court. Stipulated penalties with respect to the disputed matter shall continue to accrue, but payment shall be stayed pending resolution of the dispute, as provided in ¶ 62. Notwithstanding the stay of payment, stipulated penalties shall accrue from the first day of noncompliance with any applicable provision of this CD. In the event that SD does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XIV (Stipulated Penalties).

## XIV.  STIPULATED PENALTIES

55.     SD shall be liable to the United States and the State for stipulated penalties in the amounts set forth in ¶¶ 56.a and 56.b for failure to comply with the obligations specified in ¶¶ 56.b and 57, unless excused under Section XII (Force Majeure). Fifty percent of the stipulated penalties shall be paid to the United States and fifty percent to the State. "Comply" as used in the first sentence of this Paragraph includes compliance by SD with all applicable requirements of this CD, within the deadlines established under this CD. If an initially submitted or resubmitted Deliverable contains a material defect, and the Deliverable is disapproved or modified by EPA under ¶ 5.6(a) (Initial Submissions) or 5.6(b) (Resubmissions) of the SOW due to such material defect, then the material defect shall constitute a lack of compliance for purposes of this Paragraph.

56.    **Stipulated Penalty Amounts - Payments, Financial Assurance, Major Deliverables, and Other Milestones**

a.    The following stipulated penalties shall accrue per violation per day for any noncompliance with the obligations identified in ¶ 56.b:

| Period of Noncompliance | Penalty Per Violation Per Day |
|---|---|
| 1st through 14th day | $1,500 |
| 15th through 30th day | $2,500 |
| 31st day and beyond | $5,000 |

b.    **Obligations**

(1)    Payment of any amount due under Section X (Payments for Response Costs).

(2)    Establish and maintain financial assurance in accordance with Section IX (Financial Assurance).

(3)    Establish and maintain an escrow account to hold any disputed Future Response Costs under ¶ 39 (Contesting Future Response Costs).

(4)    Establish and maintain insurance pursuant to Section XI (Indemnification and Insurance).

(5)    Designate Project Coordinators and Supervision Contractors in accordance with Section VI (Performance of the Work).

(6)    Award RA contract(s) in accordance Section VI (Performance of the Work).

(7)    Submit RDRAWP in accordance with Section 3 (Remedial Design/Remedial Action) of the SOW.

(8)    Resubmit, if applicable, the RDRAWP in accordance with Section 5.6 (Approval of Deliverables) of the SOW.

(9)    Complete Remedial Action Construction for OU 2  in accordance with Section 3 (Remedial Design/Remedial Action) of the SOW and approved RDRAWP.

(10)    Submit Work Completion Report in accordance with Section 3 (Remedial Design/Remedial Action) of the SOW.

57.    **Stipulated Penalty Amounts – Other Deliverables**. The following stipulated penalties shall accrue per violation per day for failure to submit timely or adequate Deliverables other than those specified in Paragraph 56.b:

30

| Period of Noncompliance | Penalty Per Violation Per Day |
|---|---|
| 1st through 14th day | $1,000 |
| 15th through 30th day | $2,000 |
| 31st day and beyond | $3,000 |

58.     In the event that EPA assumes performance of a portion or all of the Work pursuant to ¶ 72 (Work Takeover), SD shall be liable for a stipulated penalty in the amount of $1,000,000. Stipulated penalties under this Paragraph are in addition to the remedies available under ¶¶ 33 (Access to Financial Assurance) and 72 (Work Takeover).

59.     All penalties shall begin to accrue on the day after the complete performance is due or the day a violation occurs and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity. However, stipulated penalties shall not accrue: (a) with respect to a deficient submission under ¶ 5.6 (Approval of Deliverables) of the SOW, during the period, if any, beginning on the 31st day after EPA's receipt of such submission until the date that EPA notifies SD of any deficiency; (b) with respect to a decision by the Director of the Superfund and Emergency Management Division, EPA Region 5, under ¶ 52.b or 53.a of Section XIII (Dispute Resolution), during the period, if any, beginning on the 21st day after the date that SD's reply to EPA's Statement of Position is received until the date that the Director issues a final decision regarding such dispute; or (c) with respect to judicial review by this Court of any dispute under Section XIII (Dispute Resolution), during the period, if any, beginning on the 31st day after the Court's receipt of the final submission regarding the dispute until the date that the Court issues a final decision regarding such dispute. Nothing in this CD shall prevent the simultaneous accrual of separate penalties for separate violations of this CD.

60.     Following EPA's determination that SD has failed to comply with a requirement of this CD, EPA may give SD written notification of the same and describe the noncompliance. EPA and the State may send SD a written demand for payment of the penalties. However, penalties shall accrue as provided in the preceding Paragraph regardless of whether EPA has notified SD of a violation.

61.     All penalties accruing under this Section shall be due and payable to the United States and the State within 30 days after SD's receipt from EPA of a demand for payment of the penalties, unless SD invokes the Dispute Resolution procedures under Section XIII (Dispute Resolution) within the 30-day period. All payments to the United States under this Section shall be made at https://www.pay.gov using the link for "EPA Miscellaneous Payments Cincinnati Finance Center," including references to the Site/Spill ID Number, the DJ Number, and the purpose of the payment. SDs shall send to DOJ and EPA, in accordance with ¶ 94, a notice of this payment including these references.

62.     Penalties shall continue to accrue as provided in ¶ 59 during any dispute resolution period, but need not be paid until the following:

31

a.      If the dispute is resolved by agreement of the parties or by a decision of EPA that is not appealed to this Court, accrued penalties determined to be owed shall be paid to EPA and the State within 15 days after the agreement or the receipt of EPA's decision or order;

b.      If the dispute is appealed to this Court and the United States prevails in whole or in part, SD shall pay all accrued penalties determined by the Court to be owed to EPA and the State within 60 days after receipt of the Court's decision or order, except as provided in ¶ 62.c;

c.      If the District Court's decision is appealed by any Party, SD shall pay all accrued penalties determined by the District Court to be owed to the United States and the State into an interest-bearing escrow account, established at a duly chartered bank or trust company that is insured by the FDIC, within 60 days after receipt of the Court's decision or order. Penalties shall be paid into this account as they continue to accrue, at least every 60 days. Within 15 days after receipt of the final appellate court decision, the escrow agent shall pay the balance of the account to EPA and the State or to SD to the extent that they prevail.

63.      If SD fails to pay stipulated penalties when due, SD shall pay Interest on the unpaid stipulated penalties as follows: (a) if SD has timely invoked dispute resolution such that the obligation to pay stipulated penalties has been stayed pending the outcome of dispute resolution, Interest shall accrue from the date stipulated penalties are due pursuant to ¶ 62 until the date of payment; and (b) if SD fails to timely invoke dispute resolution, Interest shall accrue from the date of demand under ¶ 61 until the date of payment. If SD fails to pay stipulated penalties and Interest when due, the United States or the State may institute proceedings to collect the penalties and Interest.

64.      The payment of penalties and Interest, if any, shall not alter in any way SD's obligation to complete the performance of the Work required under this CD.

65.      Nothing in this CD shall be construed as prohibiting, altering, or in any way limiting the ability of the United States or the State to seek any other remedies or sanctions available by virtue of SD's violation of this CD or of the statutes and regulations upon which it is based, including, but not limited to, penalties pursuant to Section 122(*l*) of CERCLA, 42 U.S.C. § 9622(*l*), provided, however, that the United States shall not seek civil penalties pursuant to Section 122(*l*) of CERCLA for any violation for which a stipulated penalty is provided in this CD, except in the case of a willful violation of this CD.

66.      Notwithstanding any other provision of this Section, the United States may, in its unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this CD.

32

## XV.   COVENANTS BY PLAINTIFFS

67.     **Covenants for SD by United States and the State**.

a.      By the United States.  Except as provided in ¶ 71 (General Reservations of Rights), the United States covenants not to sue or to take administrative action against SD pursuant to Sections 106 and 107(a) of CERCLA for the Work, Past Response Costs, and Future Response Costs. These covenants shall take effect upon the Effective Date. These covenants are conditioned upon the satisfactory performance by SD of its obligations under this CD and SOW. These covenants extend only to SD and do not extend to any other person.

b.      By the State.  Except as provided in ¶ 71 (General Reservations of Rights), the State of Indiana covenants not to sue or to take administrative action against SD pursuant to Indiana Code §13-25-4 et seq. for the Work, Past Response Costs, and Future Response Costs. These covenants shall take effect upon the Effective Date. These covenants are conditioned upon the satisfactory performance by SD of its obligations under this CD. These covenants extend only to SD and do not extend to any other person.

68.     **Plaintiffs' Pre-Certification Reservations**.

a.      **United States' Pre-Certification Reservations**. Notwithstanding any other provision of this CD, the United States reserves, and this CD is without prejudice to, the right to institute proceedings in this action or in a new action, and/or to issue an administrative order, seeking to compel SD to perform further response actions relating to the Site and/or to pay the United States for additional costs of response if, (a) prior to Certification of RA Completion, (1) conditions at the Site, previously unknown to EPA, are discovered, or (2) information, previously unknown to EPA, is received, in whole or in part, and (b) EPA determines that these previously unknown conditions or information together with any other relevant information indicates that the RA is not protective of human health or the environment.

b.      **State's Pre-Certification Reservations**. Notwithstanding any other provision of this CD, the State reserves, and this CD is without prejudice to, the right to institute proceedings in this action or in a new action, and/or to issue an administrative order, seeking to compel SD to perform further response actions relating to the Site and/or to pay the State for additional costs of response if, (a) prior to Certification of RA Completion, (1) conditions at the Site, previously unknown to the State, are discovered, or (2) information, previously unknown to the State, is received, in whole or in part, and (b) the State determines that these previously unknown conditions or information together with any other relevant information indicates that the RA is not protective of human health or the environment.

69.     **Plaintiffs' Post-Certification Reservations**.

a.      **United States' Post-Certification Reservations**. Notwithstanding any other provision of this CD, the United States reserves, and this CD is without prejudice to, the right to institute proceedings in this action or in a new action, and/or to issue an administrative order, seeking to compel SD to perform further response actions relating to the Site and/or to pay

33

the United States for additional costs of response if, (a) subsequent to Certification of RA Completion, (1) conditions at the Site, previously unknown to EPA, are discovered, or (2) information, previously unknown to EPA, is received, in whole or in part, and (b) EPA determines that these previously unknown conditions or this information together with other relevant information indicate that the RA is not protective of human health or the environment.

b.      **State's Post-Certification Reservations.** Notwithstanding any other provision of this CD, the State of Indiana reserves, and this CD is without prejudice to, the right to institute proceedings in this action or in a new action, and/or to issue an administrative order, seeking to compel SD to perform further response actions relating to the Site and/or to pay the State for additional costs of response if, (a) subsequent to Certification of RA Completion, (1) conditions at the Site, previously unknown to the State, are discovered, or (2) information, previously unknown to the State, is received, in whole or in part, and (b) the State determines that these previously unknown conditions or this information together with other relevant information indicate that the RA is not protective of human health or the environment or (3) a Non-Settling Owner fails to comply with restrictions contained in an Environmental Restrictive Covenant, as defined pursuant to Indiana Code § 13-11-2-193.5 and recorded pursuant to Indiana Code § 13-25-4-24, which results in the RA no longer being protective of human health or of the environment.

70.     For purposes of ¶ 68 (Plaintiffs' Pre-Certification Reservations), the information and the conditions known to EPA and the State will include only that information and those conditions known to EPA and the State as of the date the 2020 ESD was signed and set forth in the ROD for the Site and the administrative record supporting the ROD. For purposes of ¶ 69 (Plaintiffs' Post Certification Reservations), the information and the conditions known to EPA shall include only that information and those conditions known to EPA and the State as of the date of Certification of RA Completion and set forth in the ROD, the administrative record supporting the ROD, the post-ROD administrative record, or in any information received by EPA and the State pursuant to the requirements of this CD prior to Certification of RA Completion.

71.     **General Reservations of Rights**. The United States and the State reserve, and this CD is without prejudice to, all rights against SD with respect to all matters not expressly included within Plaintiffs' covenants. Notwithstanding any other provision of this CD, the United States and the State reserve all rights against SD with respect to:

a.      liability for failure by SD to meet a requirement of this CD;

b.      liability arising from the past, present, or future disposal, release, or threat of release of Waste Material outside of the Site;

c.      liability based on the ownership of the Site by SD when such ownership commences after signature of this CD by SD;

d.      liability based on the operation of the Site by SD when such operation commences after signature of this CD by SD and does not arise solely from SD's performance of the Work;

e.      liability based on SD's transportation, treatment, storage, or disposal, or arrangement for transportation, treatment, storage, or disposal of Waste Material at or in connection with the Site, other than as provided in the ROD, the Work, or otherwise ordered by EPA, after signature of this CD by SD;

f.      liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;

g.      criminal liability;

h.      liability for violations of federal or state law that occur during or after implementation of the Work; and

i.      liability, prior to achievement of Performance Standards, for additional response actions that EPA determines are necessary to achieve and maintain Performance Standards or to carry out and maintain the effectiveness of the remedy set forth in the ROD but that cannot be required pursuant to ¶ 13 (Modification of SOW or Related Deliverables);

j.      liability arising from residual Waste Materials left in place at the Site at the conclusion of the Work;

k.      liability for Properties contaminated with coal-ash related contamination that have not been addressed by the Work under this Consent Decree or ASAOC; and

l.      liability for additional operable units at the Site or the final response action; and

m.      liability for costs that the United States or State will incur regarding the Site but that are not within the definition of Future Response Costs or State Future Response Costs.

72.    **Work Takeover**

a.      In the event EPA determines that SD: (1) has ceased implementation of any portion of the Work; (2) is seriously or repeatedly deficient or late in its performance of the Work; or (3) is implementing the Work in a manner that may cause an endangerment to human health or the environment, EPA may issue a written notice ("Work Takeover Notice") to SD. Any Work Takeover Notice issued by EPA will specify the grounds upon which such notice was issued and will provide SD a period of 10 days within which to remedy the circumstances giving rise to EPA's issuance of such notice.

b.      If, after expiration of the 10-day notice period specified in ¶ 72.a, SD has not remedied to EPA's satisfaction the circumstances giving rise to EPA's issuance of the

relevant Work Takeover Notice, EPA may at any time thereafter assume the performance of all or any portion(s) of the Work as EPA deems necessary ("Work Takeover"). EPA will notify SD in writing (which writing may be electronic) if EPA determines that implementation of a Work Takeover is warranted under this ¶ 72.b. Funding of Work Takeover costs is addressed under ¶ 33 (Access to Financial Assurance).

    c.  SD may invoke the procedures set forth in ¶ 52 (Record Review), to dispute EPA's implementation of a Work Takeover under ¶ 72.b. However, notwithstanding SD's invocation of such dispute resolution procedures, and during the pendency of any such dispute, EPA may in its sole discretion commence and continue a Work Takeover under ¶ 72.b until the earlier of (1) the date that SD remedies, to EPA's satisfaction, the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, or (2) the date that a final decision is rendered in accordance with ¶ 52 (Record Review) requiring EPA to terminate such Work Takeover.

    73.  Notwithstanding any other provision of this CD, the United States and the State retain all authority and reserve all rights to take any and all response actions authorized by law.

## XVI. COVENANTS BY SD

    74.  **Covenants by SD**. Subject to the reservations in ¶ 76, SD covenants not to sue and agrees not to assert any claims or causes of action against the United States or the State with respect to the Work, past response actions regarding the Site, Past Response Costs, Future Response Costs, State Future Response Costs, and this CD, including, but not limited to:

    a.  any direct or indirect claim for reimbursement from the EPA Hazardous Substance Superfund through CERCLA §§ 106(b)(2), 107, 111, 112 or 113, or any other provision of law;

    b.  any claims under CERCLA §§ 107 or 113, RCRA Section 7002(a), 42 U.S.C. § 6972(a), or state law regarding the Work, past response actions regarding the Site, Past Response Costs, Future Response Costs, State Past Response Costs, State Future Response Costs, and this CD; or

    c.  any claims arising out of response actions at or in connection with the Site, including any claim under the United States Constitution, the State of Indiana Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, or at common law.

    75.  Except as provided in ¶¶ 78 (Waiver of Claims by SD) and 85 (Res Judicata and Other Defenses), the covenants in this Section shall not apply if the United States or the State brings a cause of action or issues an order pursuant to any of the reservations in Section XV (Covenants by Plaintiffs), other than in ¶¶ 71.a (claims for failure to meet a requirement of the CD), 71.g (criminal liability), and 71.h (violations of federal/state law during or after implementation of the Work), but only to the extent that SD's claims arise from the same

36

response action, response costs, or damages that the United States or the State is seeking pursuant to the applicable reservation.

76. SD reserves, and this CD is without prejudice to, claims against the United States, subject to the provisions of Chapter 171 of Title 28 of the United States Code, and brought pursuant to any statute other than CERCLA or RCRA and for which the waiver of sovereign immunity is found in a statute other than CERCLA or RCRA, for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States, as that term is defined in 28 U.S.C. § 2671, while acting within the scope of his or her office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. However, the foregoing shall not include any claim based on EPA's selection of response actions, or the oversight or approval of SD's Deliverables or activities.

77. Nothing in this CD shall be deemed to constitute approval or preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

78. **Waiver of Claims by SD**.

a. SD agrees not to assert any claims and to waive all claims or causes of action (including but not limited to claims or causes of action under Sections 107(a) and 113 of CERCLA) that it may have:

(1) **De Micromis Waiver**. For all matters relating to the Site against any person where the person's liability to SD with respect to the Site is based solely on having arranged for disposal or treatment, or for transport for disposal or treatment, of hazardous substances at the Site, or having accepted for transport for disposal or treatment of hazardous substances at the Site, if all or part of the disposal, treatment, or transport occurred before April 1, 2001, and the total amount of material containing hazardous substances contributed by such person to the Site was less than 110 gallons of liquid materials or 200 pounds of solid materials;

(2) ***De Minimis*/Ability to Pay Waiver**. For response costs relating to the Site against any person that has entered or in the future enters into a final CERCLA § 122(g) *de minimis* settlement, or a final settlement based on limited ability to pay, with EPA with respect to the Site.

(3) The waiver under ¶ 78.a(1) (De Micromis Waiver) shall not apply to any claim or cause of action against any person otherwise covered by such waiver if EPA determines that: (i) the materials containing hazardous substances contributed to the Site by such person contributed significantly or could contribute significantly, either individually or in the aggregate, to the cost of the

37

response action or natural resource restoration at the Site; or (ii) such person has failed to comply with any information request or administrative subpoena issued pursuant to Section 104(e) or 122(e)(3)(B) of CERCLA, 42 U.S.C. § 9604(e) or 9622(e)(3)(B), or Section 3007 of RCRA, 42 U.S.C. § 6927, or has impeded or is impeding, through action or inaction, the performance of a response action or natural resource restoration with respect to the Site; or if (iii) such person has been convicted of a criminal violation for the conduct to which the waiver would apply and that conviction has not been vitiated on appeal or otherwise.

    b.    **Exceptions to Waivers**

        (1)    The waivers under this ¶ 78 shall not apply with respect to any defense, claim, or cause of action that SD may have against any person otherwise covered by such waivers if such person asserts a claim or cause of action relating to the Site against SD.

    79.    SD agrees not to seek judicial review of the final rule listing the Site on the NPL based on a claim that changed site conditions that resulted from the performance of the Work in any way affected the basis for listing the Site.

## XVII. EFFECT OF SETTLEMENT; CONTRIBUTION

    80.    Except as provided in ¶ 78 (Waiver of Claims by SD), nothing in this CD shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this CD. Except as provided in Section XVI (Covenants by SD), each of the Parties expressly reserves any and all rights (including, but not limited to, pursuant to Section 113 of CERCLA, 42 U.S.C. § 9613), defenses, claims, demands, and causes of action that each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Site against any person not a Party hereto. Nothing in this CD diminishes the right of the United States, pursuant to Section 113(f)(2) and (3) of CERCLA, 42 U.S.C. § 9613(f)(2)-(3), to pursue any such persons to obtain additional response costs or response action and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2).

    81.    The Parties agree, and by entering this CD this Court finds, that this CD constitutes a judicially-approved settlement pursuant to which SD has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and is entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA, or as may be otherwise provided by law, for the "matters addressed" in this CD. The "matters addressed" in this CD are the Work, Past Response Costs, Future Response Costs, State Past Response Costs, and State Future Response Costs.

    82.    The Parties further agree, and by entering this CD this Court finds, that the complaint filed by the United States and the State in this action is a civil action within the meaning of Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), and that this CD constitutes a

judicially-approved settlement pursuant to which SD has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B) and resolved liability to the State of Indiana regarding claims at the Site under IC 13-25-4 et seq.

83.     SD shall, with respect to any suit or claim brought by it for matters related to this CD, notify the United States and the State in writing no later than 60 days prior to the initiation of such suit or claim.

84.     SD shall, with respect to any suit or claim brought against it for matters related to this CD, notify in writing the United States and the State within 10 days after service of the complaint on SD. In addition, SD shall notify the United States and the State within 10 days after service or receipt of any Motion for Summary Judgment and within 10 days after receipt of any order from a court setting a case for trial.

85.     **Res Judicata and Other Defenses**. In any subsequent administrative or judicial proceeding initiated by the United States or the State for injunctive relief, recovery of response costs, or other appropriate relief relating to the Site, SD shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the State in the subsequent proceeding were or should have been brought in the instant case; provided, however, that nothing in this Paragraph affects the enforceability of the covenants not to sue set forth in Section XV (Covenants by Plaintiffs).

## XVIII.        ACCESS TO INFORMATION

86.     SD shall provide to EPA and the State, upon request, copies of all records, reports, documents, and other information (including records, reports, documents, and other information in electronic form) (hereinafter referred to as "Records") within SD's possession or control or that of its contractors or agents relating to activities at the Site or to the implementation of this CD, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information regarding the Work. SD shall also make available to EPA and the State, for purposes of investigation, information gathering, or testimony, its employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work.

87.     **Privileged and Protected Claims**.

a.     SD may assert that all or part of a Record requested by Plaintiffs is privileged or protected as provided under federal law, in lieu of providing the Record, provided SD complies with ¶ 87.b, and except as provided in ¶ 87.c.

b.     If SD asserts a claim of privilege or protection, SD shall provide Plaintiffs with the following information regarding such Record: its title; its date; the name, title, affiliation (e.g., company or firm), and address of the author, of each addressee, and of each recipient; a

description of the Record's contents; and the privilege or protection asserted. If a claim of privilege or protection applies only to a portion of a Record, SD shall provide the Record to Plaintiffs in redacted form to mask the privileged or protected portion only. SD shall retain all Records that it claims to be privileged or protected until Plaintiffs have had a reasonable opportunity to dispute the privilege or protection claim and any such dispute has been resolved in the SD's favor.

        c.      SD may make no claim of privilege or protection regarding: (1) any data regarding the Site, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, radiological or engineering data, or the portion of any other Record that evidences conditions at or around the Site; or (2) the portion of any Record that SD is required to create or generate pursuant to this CD.

      88.     **Business Confidential Claims**. SD may assert that all or part of a Record provided to Plaintiffs under this Section or Section XIX (Retention of Records) is business confidential to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b). SD shall segregate and clearly identify all Records or parts thereof submitted under this CD for which SD asserts business confidentiality claims. Records that SD claims to be confidential business information will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B. If no claim of confidentiality accompanies Records when they are submitted to EPA and the State, or if EPA has notified SD that the Records are not confidential under the standards of Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2, Subpart B, the public may be given access to such Records without further notice to SD.

      89.     If relevant to the proceeding, the Parties agree that validated sampling or monitoring data generated in accordance with the SOW and reviewed and approved by EPA shall be admissible as evidence, without objection, in any proceeding under this CD.

      90.     Notwithstanding any provision of this CD, Plaintiffs retain all of their information gathering and inspection authorities and rights, including enforcement actions related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

## XIX.  RETENTION OF RECORDS

      91.     Until 10 years after EPA's Certification of Work Completion under ¶ 3.10 (Certification of Work Completion) of the SOW, SD shall preserve and retain all non-identical copies of Records (including Records in electronic form) now in its possession or control or that come into its possession or control that relate in any manner to its liability under CERCLA with respect to the Site, provided, however, that SD must retain, in addition, all Records that relate to the liability of any other person under CERCLA with respect to the Site. SD must also retain, and instruct its contractors and agents to preserve, for the same period of time specified above, all non-identical copies of the last draft or final version of any Records (including Records in electronic form) now in its possession or control or that come into its possession or control that relate in any manner to the performance of the Work, provided, however, that SD (and its contractors and agents) must retain, in addition, copies of all data generated during the

performance of the Work and not contained in the aforementioned Records required to be retained. Each of the above record retention requirements shall apply regardless of any corporate retention policy to the contrary.

92.     At the conclusion of this record retention period, SD shall notify the United States and the State at least 90 days prior to the destruction of any such Records, and, upon request by the United States or the State, and except as provided in ¶ 87 (Privileged and Protected Claims), SD shall deliver any such Records to EPA or the State.

93.     SD certifies, to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed, or otherwise disposed of any Records (other than identical copies) relating to its potential liability regarding the Site since notification of potential liability by the United States or the State and that it has fully complied with any and all EPA and State requests for information regarding the Site pursuant to Sections 104(e) and 122(e)(3)(B) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e)(3)(B), and Section 3007 of RCRA, 42 U.S.C. § 6927, and state law.

## XX.   NOTICES AND SUBMISSIONS

94.     All approvals, consents, Deliverables, modifications, notices, notifications, objections, proposals, reports, and requests specified in this CD must be in writing unless otherwise specified. Whenever, under this CD, notice is required to be given, or a report or other document is required to be sent, by one Party to another, it must be directed to the person(s) specified below at the address(es) specified below. Any Party may change the person and/or address applicable to it by providing notice of such change to all Parties. All notices under this Section are effective upon receipt, unless otherwise specified. Notices required to be sent to EPA, and not to the United States, should not be sent to the DOJ. Except as otherwise provided, notice to a Party by email (if that option is provided below) or by regular mail in accordance with this Section satisfies any notice requirement of the CD regarding such Party.

**As to the United States**:          EES Case Management Unit
                                       U.S. Department of Justice
                                       Environment and Natural Resources Division
                                       P.O. Box 7611
                                       Washington, D.C. 20044-7611
                                       eescdcopy.enrd@usdoj.gov
                                       Re: DJ # 90-11-3-12060

41

**As to EPA**:                          Douglas Ballotti
                                        Director, Superfund and Emergency
                                        Management Division
                                        U.S. Environmental Protection Agency
                                        Region 5
                                        77 W. Jackson Boulevard
                                        Mail Code S-6J
                                        Chicago, Illinois 60604
                                        Balotti.douglas@epa.gov

**and**:                                Erik Hardin
                                        EPA Project Coordinator
                                        U.S. Environmental Protection Agency
                                        Region 5
                                        77. W. Jackson Boulevard
                                        Mail Code SR-6J
                                        Chicago, Illinois 60604
                                        Hardin.erik@epa.gov
                                        (312) 886-2402

**As to the Regional Comptroller**      Dale Meyer
**and Accountant**:                     Comptroller, Resource Management Divison
                                        U.S. Environmental Protection Agency
                                        Region 5
                                        77 W. Jackson Boulevard
                                        Mail Code MF-10J
                                        Chicago, Illinois 60604
                                        meyer.dale@epa.gov

                                        Justin Abrams
                                        Accountant, Program Accounting and
                                        Analysis Section
                                        U.S. Environmental Protection Agency
                                        Region 5
                                        77 W. Jackson Blvd.
                                        Mail Code MF-10J
                                        Chicago, Illinois 60604
                                        abrams.justin@epa.gov

**At to EPA Cincinnati Finance**        EPA Cincinnati Finance Center
**Center**:                             26 W. Martin Luther King Drive
                                        Cincinnati, Ohio 45268
                                        cinwd_acctsreceivable@epa.gov

42

| | |
|---|---|
| **As to the State**: | Resa Ramsey<br>State Project Coordinator<br>Indiana Department of Environmental Management<br>100 North Senate Avenue<br>Mail Code 66-31; IGCN 1101<br>rramsey@idem.in.gov |
| **As to SD**: | Daniel Sullivan<br>SD's Project Coordinator<br>Northern Indiana Public Service<br>Company<br>Attn: Environmental Department (Pines<br>Site)<br>801 E. 86th Avenue<br>Merrillville, IN 46410 dsullivan@nisource.com<br>(219) 647-5248 |

## XXI.   RETENTION OF JURISDICTION

95.     This Court retains jurisdiction over both the subject matter of this CD and SD for the duration of the performance of the terms and provisions of this CD for the purpose of enabling any of the Parties to apply to the Court at any time for such further order, direction, and relief as may be necessary or appropriate for the construction or modification of this CD, or to effectuate or enforce compliance with its terms, or to resolve disputes in accordance with Section XIII (Dispute Resolution).

## XXII. APPENDICES

96.     The following appendices are attached to and incorporated into this CD:

"Appendix A" is the ROD.

"Appendix B" is the SOW.

"Appendix C" map of Site with OU 2 delineated.

## XXIII.         MODIFICATION

97.     Except as provided in ¶ 13 (Modification of SOW or Related Deliverables), material modifications to this CD, including the SOW, shall be in writing, approved by the State and signed by the United States and SD, and shall be effective upon approval by the Court. Except as provided in ¶ 13, non-material modifications to this CD, including the SOW, shall be in writing and shall be effective when signed by duly authorized representatives of the United States and SD. All modifications to the CD, other than the SOW, also shall be signed by the State, or a duly authorized representative of the State, as appropriate. A modification to the SOW

43

shall be considered material if it implements a ROD amendment that fundamentally alters the basic features of the selected remedy within the meaning of 40 C.F.R. § 300.435(c)(2)(ii). Before providing its approval to any modification to the SOW, the United States will provide the State with a reasonable opportunity to review and comment on the proposed modification.

98.     Nothing in this CD shall be deemed to alter the Court's power to enforce, supervise, or approve modifications to this CD.

### XXIV.     LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

99.     This CD shall be lodged with the Court for at least 30 days for public notice and comment in accordance with Section 122(d)(2) of CERCLA, 42 U.S.C. § 9622(d)(2), and 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments regarding the CD disclose facts or considerations that indicate that the CD is inappropriate, improper, or inadequate. SD consents to the entry of this CD without further notice.

100.     If for any reason the Court should decline to approve this CD in the form presented, this agreement is voidable at the sole discretion of any Party and the terms of the agreement may not be used as evidence in any litigation between the Parties.

### XXV. SIGNATORIES/SERVICE

101.     Each undersigned representative of Defendant certify that he or she is fully authorized to enter into the terms and conditions of the Consent Decree and to execute and legally bind the Party he or she represents to this document. The Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice identified on the DOJ signature page below, is fully authorized to enter into the terms and conditions of this Consent Decree and to legally bind the United States to this document.

102.     SD agrees not to oppose entry of this CD by this Court or to challenge any provision of this CD unless the United States has notified SD in writing that it no longer supports entry of the CD.

103.     SD shall identify, on the attached signature page, the name, address, and telephone number of an agent who is authorized to accept service of process by mail on behalf of that Party with respect to all matters arising under or relating to this CD. SD agrees to accept service in that manner and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court, including, but not limited to, service of a summons. SD needs not file an answer to the complaint in this action unless or until the Court expressly declines to enter this CD.

### XXVI.     FINAL JUDGMENT

104.     This CD and its appendices constitute the final, complete, and exclusive agreement and understanding among the Parties regarding the settlement embodied in the CD.

The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this CD.

105.    Upon entry of this CD by the Court, this CD shall constitute a final judgment between and among the United States, the State, and SD. The Court enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

106.    Upon the effective date of this CD and upon EPA approval of the RDRAWP, as set forth in Sections 3 and 5 of the SOW, and upon the agreement of all Parties, the ASAOC may be terminated. Any such termination, by itself, shall not be considered a modification of this Consent Decree.


SO ORDERED THIS __ DAY OF _____, 2022.


_____
United States District Judge

45

Signature Page for CD regarding the Town of Pines Superfund Site

**FOR THE UNITED STATES OF AMERICA:**

TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division
Washington, D.C.  20530

2/28/2022
—————————
Dated

STEVEN ELLIS

Digitally signed by STEVEN ELLIS
Date: 2022.02.28 14:58:18 -05'00'

—————————————————————
STEVEN D. ELLIS
Senior Counsel
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611
Washington, D.C.  20044-7611

46

Signature Page for CD regarding the Town of Pines Superfund Site

**FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:**

02/02/22

Digitally signed by
DOUGLAS BALLOTTI
Date: 2022.02.02
07:00:16 -06'00'

Dated

DOUGLAS BALLOTTI

Director

Superfund & Emergency Management Division.
Region 5

U.S. Environmental Protection Agency

77 W. Jackson Blvd.

Chicago, Illinois  60604

02/01/22

TAMARA
CARNOVSKY

Digitally signed by
TAMARA
CARNOVSKY
Date: 2022.02.01
14:08:07 -06'00'

Dated

TAMARA E. CARNOVSKY

Associate Regional Counsel

U.S. Environmental Protection Agency

Region 5

77 W. Jackson Boulevard

Chicago, Illinois  60604

47

Signature Page for CD regarding the Town of Pines Superfund Site

**FOR THE STATE OF INDIANA:**

January 27, 2022
Dated

PATRICIA ERDMANN
Chief Counsel for Litigation
Office of Attorney General Todd Rokita
302 West Washington Street
IGCS-5th Floor
Indianapolis, IN  46204

48

Signature Page for CD regarding the Town of Pines Superfund Site

**FOR THE STATE OF INDIANA ON BEHALF OF THE INDIANA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT:**

12/3/2021
_____
Dated

_____
PEGGY DORSEY
Assistant Commissioner, Office of Land Quality
100 N. Senate Avenue
IGCN Rm 1104
Indianapolis, IN  46204

49

Signature Page for CD regarding the Town of Pines Superfund Site

**FOR NORTHERN INDIANA PUBLIC SERVICE COMPANY, LLC:**

12-13-2021
_____
Dated

Name (print):   Michael W. Hooper
Title:              President, NIPSCO
Address:         801 E. 86th Avenue
                    Merrillville, IN 46410

Agent Authorized to Accept Service   Name (print):   Gabriel M. Rodriguez
on Behalf of Above-signed Party:      Title:              Attorney of Record
                                        Company:       Schiff Hardin LLP
                                        Address:        233 South Wacker Drive - Ste 7100
                                                         Chicago, Illinois 60606
                                        Phone:          312-258-5500
                                        email:           grodriguez@schiffhardin.com

50