UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF INDIANA, | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | )  2:22CV48-PPS/JPK ) |
| NORTHERN INDIANA PUBLIC SERVICE COMPANY LLC , | ) ) ) ) |
| Defendant. | ) |

## OPINION AND ORDER

The Northern Indiana Public Service Company LLC, known familiarly as NIPSCO, operates a power plant in Michigan City, Indiana, on the shore of Lake Michigan. The plant has generated coal combustion residuals (CCRs) called "coal ash." [DE 8 at 4.] NIPSCO deposited CCRs in a landfill known as "Yard 520." [*Id*.] From there, some of the coal ash migrated into groundwater. [*Id*.] The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) authorizes the Environmental Protection Agency to investigate hazardous waste sites and command responsible private parties to provide remedial action. 42 U.S.C. §9604(a)(1), (b)(1). An EPA Superfund Site has been defined with an estimated 1,435 acres including properties where NIPSCO's coal ash was deposited and areas of groundwater contaminated by coal ash. [*Id*. at 3, n.2.]

After years of investigation, action, and negotiation, the United States, the State of Indiana, and NIPSCO have agreed to a Consent Decree resolving NIPSCO's liability

to the state and federal governments under CERCLA by requiring NIPSCO to perform the remedy selected by the EPA to address the releases of hazardous substances at what is defined as Operable Unit 2 of the Town of Pines Superfund Site.  After lodging the proposed Consent Decree with the court in March of 2022 [DE 2], the Department of Justice published the Consent Decree in the Federal Register and solicited public comments over a period of 30 days. [DE 8 at 1.]  The United States has now filed a motion requesting the approval and entry of the Consent Decree.  [DE 9.]

"[T]he district court must approve a consent decree if it is reasonable, consistent with CERCLA's goals, and substantively and procedurally fair." *United States v. George A. Whiting Paper Co.*, 644 F.3d 368, 372 (7th Cir. 2011).  The Seventh Circuit has emphasized the deferential approach courts must take to the approval of a consent decree posed by the government under CERCLA.  *Id.*  I have carefully reviewed the memorandum in support of the motion to approve the consent decree [DE 8], along with the proposed consent decree itself [DE 2], and the public comments that were received. [DE 8-1, 8-2, 8-3].  For the reasons set forth below, I find the consent decree is fair, reasonable, and consistent with the underlying statutes as well as the public interest.

## Background of the Superfund Site and the Consent Decree

In 2000 the EPA and NIPSCO began conducting sampling to investigate contamination in the Site.  [*Id*. at 5.]  Elevated concentrations of various hazardous

substances were found. [*Id*.] The investigation and efforts to address the dangers continued over a long period of years.

A determination in 2002 that groundwater posed a potential health risk resulted in the provision of bottled water service to residences where elevated levels of metals and volatile organic compounds were found. [*Id*. at 5.] In 2003 and 2004, NIPSCO and three other potentially responsible parties – Brown, Inc., Ddalt Corporation, and Bulk Transport Corp. – entered into two Administrative Orders on Consent ("AOCs") with the EPA, including one that extended Michigan City municipal drinking water service to homes within the Site that had private wells with potential groundwater contamination. [*Id*.] Also in 2004, a Remedial Investigation/Feasability Study performed for the Site revealed that fill material used throughout the Town of Pines was composed of "fly ash" from NIPSCO's operations, containing unacceptable levels of arsenic, thallium and lead. [*Id*. at 5.]

In 2015, the EPA issued an Action Memorandum calling for "time-critical removal action to address the fly ash contamination found at the Site." [Hardin Decl. ¶9, DE 8-4 at 3.] In 2016, NIPSCO agreed in an Administrative Settlement Agreement and Order on Consent ("ASAOC") to perform specified actions including identifying areas of unacceptable exposure risk due to coal ash, removing contaminated soils and disposing of them off-site, and using clean fill to restore the affected property. [DE 8 at 6.] Pursuant to this ASAOC, NIPSCO has removed contamination from 17 of the 19

3

identified properties; the two remaining property owners have not permitted NIPSCO to excavate contaminated soil. [*Id*.]

When the EPA determines the appropriate remedy for a Superfund site, it issues a Record of Decision ("ROD"). 40 C.F.R. §300.430(f). Typically the remedy identified by the EPA includes a design of the remedy component ("Remedial Design" or "RD") and an implementation component ("Remedial Action" or "RA.") [DE 8 at 2.] Concerning this Site, the EPA issued a ROD in September 2016, prescribing a remedy including continuation of the sampling, excavation, and restoration of excavated properties, the use of phytoremediation to remove contaminants from groundwater, long-term groundwater monitoring and land use controls. [ROD 4.0, DE 2-2 at 7.] The EPA has divided the Town of Pines Superfund Site into two sections, called "operable units." The proposed Consent Decree addresses only the remedy for Operable Unit 2 ("OU2"), which "consists of contamination of soil, groundwater, and drinking water wells from the disposal of CRs outside of Yard 520." [DE 8 at 6.][1]

The EPA notified known responsible parties of their liability in May 2020, and offered the option to agree to perform the remedial design and remedial action for the Site. [DE 8 at 6.] Over the ensuing 18 months, the parties discussed and negotiated the terms of the proposed Consent Decree, under which NIPSCO will complete all the prescribed remedial work for OU2 at the Site. During those talks, all parties were

---

[1] Operable Unit 1 is "the portion of the Site where groundwater contamination from the disposal of CCRs at Yard 520 has come to be located." [DE 8 at 6.]

represented by counsel, and a number of drafts were exchanged before the final terms were agreed upon.  [DE 8 at 6-7.]

## Terms of the Proposed Consent Decree

The Consent Decree would require NIPSCO to implement the remedy selected by the ROD for OU2, including a soil component consisting of additional sampling and cleanup as needed, and a component involving monitoring of groundwater, surface water and sediment.  [DE 8 at 7.]  Implementation of the soil component will require NIPSCO to sample soil within a defined area in order to identify contamination above cleanup levels, then excavate and dispose of contaminated soil off-site, restore excavated properties with clean backfill, and use institutional controls to prevent exposure to contaminated soil left three or more feet below the ground surface.  The other component of the remedy requires NIPSCO to monitor residential drinking water wells, groundwater monitoring wells, surface water and sediments within a prescribed area.  [*Id*. at 8.]  The EPA estimates that meeting the requirements of the Consent Decree will cost NIPSCO $11.79 million.  [Hardin Decl. ¶20, DE 8-4 at 6.]

NIPSCO's performance of the remedy required by the Consent Decree will be overseen and enforced by the EPA, which must approve reports and work plans required of NIPSCO.  [DE 8 at 8.]  If NIPSCO fails to perform the required remedial actions, it would be subject to stipulated penalties and the EPA is authorized to take over the work.  [*Id.*]  The Consent Decree provides that, if requested by the EPA, NIPSCO must conduct community involvement activities, such as preparing

explanatory information for public dissemination and designating a community involvement coordinator. [*Id*.] NIPSCO will be required to reimburse the United States and the State of Indiana for costs they have incurred in connection with the site from April 1, 2019 to the date the Consent Decree is entered, and for future response costs the governments incur in connection with the work to be performed under the Consent Decree, such as the costs of overseeing NIPSCO's performance. [DE 8 at 9.] NIPSCO will pay roughly 75% of the United States' past response costs incurred prior to March 31, 2019, in the amount of $619,632.16. [*Id*.]

## Decision to Approve the Consent Decree

In deciding whether to approve of the consent decree before me, I keep in mind the following standards:

> Approval of a consent decree is a judicial act committed to the sound discretion of the district court. A district court reviews a consent decree to determine whether it is fair, adequate, reasonable, and consistent with applicable law. Of particular importance in that analysis is determining whether a proposed decree adequately protects and is consistent with the public interest.
>
> In analyzing the decree before it, the Court should be aware of the policy favoring approval. Public policy strongly favors voluntary settlement of disputes without litigation. And that policy is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal agency, like the EPA, which enjoys substantial expertise in the environmental field. But that deference to the Government's judgment should by no means be a rubber stamp. Instead, the Court must conduct an individual evaluation based on the particular facts of the case but with caution not to substitute its judgment for that of the parties or engage in the type of detailed investigation that would be required if the parties were trying the case.

*United States, et al. v. U.S. Steel Corp.*, No. 2:18-cv-127, 2021 WL 3884852, at *6 (N.D. Ind. Aug. 30, 2021) (citations omitted).

**Fairness of the Consent Decree**

The requirement of fairness includes both procedural and substantive aspects. *In re Tutu Water Wells CERCLA Litigation*, 326 F.3d 201, 207 (3rd Cir. 2003); *United States v. BP Exploration & Oil Co.*, 167 F.Supp.2d 1045, 1051 (N.D. Ind. 2001). I find the proposed Consent Decree is procedurally fair because it was negotiated at arms-length between parties represented by experienced counsel. *Id.* The negotiations were conducted with "candor, openness and bargaining balance." *United States v. Cannons Eng'g*, 899 F.2d 79, 86 (1st Cir. 1990). That the Consent Decree was lodged for public comment also supports my finding of procedural fairness. *George A. Whiting Paper Co.*, 644 F.3d at 373.

"A consent decree is substantively fair if its terms are based on comparative fault." *George A. Whiting Paper Co.*, 644 F.3d at 372, citing *Tutu Water Wells*, 326 F.3d at 207; *Cannons Eng'g*, 899 F.2d at 87. The Consent Decree is substantively fair because it imposes on NIPSCO significant burdens both of responsibility for remedying contamination that originated from its Michigan City power plant and of shouldering the costs incurred by the state and federal governments in responding to NIPSCO's releases of hazardous substances. Substantive fairness recognizes considerations of the "uncertainty of outcome in litigation, as well as the avoidance of wasteful litigation and expense," and therefore the prudence of "eliminat[ing] the risks of litigation to achieve

specific certainty though admittedly it might be considerably less (or more) than were the case fought to the bitter end." *Florida Trailer and Equipment Co. v. Deal*, 284 F.2d 567, 571, 573 (5th Cir. 1960). The determination of comparative fault "should be upheld unless it is arbitrary, capricious, and devoid of a rational basis." *Cannons Eng'g*, 899 F.2d at 87. The proposed Consent Decree meets the test of assessing appropriate accountability on NIPSCO.

**Reasonableness and Adequacy in View of CERCLA's Aims**

In order to approve the Consent Decree, I must find it to be reasonable and adequate. In assessing reasonableness, courts have considered these factors: "the nature/extent of hazards; the degree to which the remedy will adequately address the hazards; possible alternatives for remedying hazards; and the extent to which the decree furthers the goals of the statute." *United States v. Akzo Coatings of America, Inc.*, 949 F.2d 1409, 1436 (6th Cir. 1991). The court has only a "limited duty" (as well as a limited ability) to "inquire into the technical aspects of the cleanup program proposed by a consent decree." *Akzo Coatings*, 949 F.2d at 1436, citing *United States v. Seymour Recycling Corp.*, 554 F.Supp. 1334, 1338 (S.D.Ind. 1982). Nonetheless, I can conclude that the Consent Decree is reasonable and adequate in that it requires NIPSCO to implement the remedy elected by the EPA for the coal ash contamination at Operable Unit 2 of the Town of Pines Superfund Site, subject to detailed criteria, schedules and reporting requirements which enable EPA oversight of the work.

Also supporting this finding are the Consent Decree's penalties in the event of NIPSCO's default and the provisions for the EPA to "take over the work itself using the funds that NIPSCO is required to provide as financial assurance." [DE 8 at 18.] If as time goes by the EPA determines that the remedy selected in the ROD is not protective of human health, the EPA may amend the ROD to select additional response actions and may seek to require NIPSCO to perform them. [DE 8 at 18.] All these factors support my finding that the proposed Consent Decree is a reasonable and adequate resolution to the contamination NIPSCO caused at the site, and that the Consent Decree furthers the goals of CERCLA.

Last but not at all least I have considered the comments received after the proposed Consent Decree was published in the Federal Register for public review. In its motion for entry of the Consent Decree, the United States has provided the comments received from three parties (two individuals and one organization), as well as the EPA's response to their concerns. Each commenter suggested that additional sampling or studies should be done. The government explains that concerns particularly raised about hexavalent chromium are unwarranted because a 2017 study evaluated 172 samples and found none exceeded the EPA's cleanup goals for hexavalent chromium. [DE 8 at 19.] As to comments requesting additional soil sampling, the EPA responds that NIPSCO will be required to sample for contamination every property within the OU2 geographical area that has not already been sampled, and excavate soil contaminated above the clean-up levels. [DE 8 at 20.] The EPA

9

further explains that it is highly unlikely that soil contamination has spread because there "is no naturally-occurring mechanism by which the CCR material can be transported to other properties in quantities sufficient to exceed cleanup levels." [*Id.*]

To the comment urging additional groundwater monitoring, the EPA reasonably responds that the Consent Decrees requirements that NIPSCO monitor groundwater, surface water, and sediment are adequate based on known information, and that "if new data indicate an unaddressed risk pathway, the EPA can require additional measures, including expanding the monitoring boundaries and cleanup activities." [DE 8 at 21.] Consideration of further health studies was requested by all three commenters. The EPA replies that when investigations disclosed additional soil contamination after the baseline human health risk assessment in 2012, the EPA required that soil cleanups default to "the lowest cleanup level that the EPA could legally require," which would "prevent human exposure to unacceptable levels of soil contamination." [*Id.*] Further, the EPA points out that the requirement that contaminated soil be excavated to a depth of three feet "protects public health by preventing direct contact with the contaminants." [*Id.*]

As for groundwater, the EPA response indicates that the Consent Decree is adequately protective of human health given the removal actions that have already taken place and the provision of municipal water service. [DE 8 at 22.] Groundwater sampling conducted after the 2012 health assessment found no contaminants of concern (i.e., boron, arsenic, or molybdenum) above cleanup levels in any private wells or

monitoring wells. [*Id*.] And 2015 sampling disclosed no CCR-related groundwater contamination beyond the area provided with municipal water. [*Id*.] But if groundwater monitoring required of NIPSCO under the Consent Decree determines that migration of contamination above cleanup levels is occurring and threatening private wells, the EPA can consider adjusting the remedy to be provided by NIPSCO. [*Id.* at 22-23.] The EPA's discussion supports the conclusion that the public comments do not demonstrate that the proposed Consent Decree is inadequate or unreasonable. I note also that the motion for approval of the Consent Decree, including the EPA's responses to all the comments, appeared on the public docket over a month ago, and that no attempt has been made to lodge any rebuttal with the court.

**The Public Interest**

All the reasons previously cited for approval of the Consent Decree also support the conclusion that the Consent Decree serves the public interest. The Consent Decree will serve CERCLA's goals of protecting and preserving public health and the environment from the effects of the release of hazardous substances and ensuring that those responsible for problems caused by disposal of hazardous chemicals bear the burden of remedying the harmful conditions they created. *BP Exploration & Oil Co.*, 167 F.Supp.2d at 1045. The public interest is also served by the Consent Decree's requirement of prompt implementation of a remedy by NIPSCO, using its resources, rather than the considerable expense, uncertainty and delay inherent in litigation of CERCLA liability.

## Conclusion

"By its nature, a consent decree eliminates many possible outcomes that would have been better for one side or the other." *George A. Whiting Paper Co.*, 644 F.3d at 374. This is true of every settlement, which by definition is a compromise by each party. I will approve the parties' proposed Consent Decree, finding it to be fair, reasonable, adequate, consonant with the goals of CERCLA, and in the public interest.

**ACCORDINGLY:**

The Unopposed Motion to Enter Consent Decree for Operable Unit 2 of the Town of Pines Superfund Site [DE 9] is GRANTED.

The Remedial Design/Remedial Action Consent Decree for Operable Unit 2 of the Town of Pines Superfund Site [DE 2-1] is hereby APPROVED, and the Clerk shall detach and separately docket and file the Consent Decree [DE 2-1], thereby CLOSING this matter.

**SO ORDERED.**

**ENTERED:** September 12, 2022.

                                               /s/ Philip P. Simon  
                                               **PHILIP P. SIMON, JUDGE**  
                                               **UNITED STATES DISTRICT COURT**